DEAN B. SMITH AND IRMA SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JAMES KARR AND NANCY L. KARR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 48306-86, 309-87.     Filed October 3, 1988.

*Dennis N. Brager* and *Jackson D. Hamilton,* for the petitioners.

*Martin D. Cohen* and *William H. Quealy, Jr.,* for the respondent.

---

COHEN, *Judge:* Respondent determined deficiencies in and additions to petitioners' income tax as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax sec. 6661[1] |
|---|---|---|---|---|
| 48306-86 | Smith | 1981 | $19,505.00 | - - - |
|  |  | 1982 | 13,059.64 | $1,303.00 |
| 309-87 | Karr | 1981 | 8,907.77 | - - - |
|  |  | 1982 | 7,972.84 | 797.28 |

After concessions, the issues for decision are as follows:

(1) Whether petitioners are entitled to deduct their pro rata share of the losses of certain limited partnerships on their 1981 and 1982 income tax returns;

(2) Whether petitioners are liable for additions to tax under section 6659;

(3) Whether petitioners are liable for additions to tax under section 6661 for 1982; and

(4) Whether petitioners are required to pay additional interest under section 6621(c) on any underpayment.

FINDINGS OF FACT

I. *Background*

Many of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners Karr and Smith resided in Georgia and Michigan, respectively, when their petitions were filed. In each of the years in issue, petitioner James Karr was a limited partner in Peat Oil & Gas Associates, Ltd. (POGA); petitioners Smith were limited partners in Syn-Fuel Associates, Ltd. (SFA). POGA and SFA were putatively formed to exploit a technique known as the Koppelman Process.

The Koppelman Process refines wood, peat, lignite, and other low-grade biomass or fossil fuel into a dry, stable, higher-heating-value solid fuel, physically resembling coal, known as K-Fuel. In general, K-Fuel is produced by placing

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue.

raw material, known as feedstock, into a Koppelman reactor, where it is dried and carbonized at high temperature and pressure.

This technique was developed by Edward Koppelman (Koppelman). In 1980, the U.S. Department of Energy (the DOE) awarded to Koppelman a $727,882 grant to study the feasibility of the Koppelman Process. Pursuant to the 1980 grant, Koppelman, SRI International (SRI), the University of Maine, Lehman Brothers Kuhn Loeb Inc., Ekono Inc., Central Maine Power Co., and Stone & Webster Engineering Corp. (Stone & Webster) prepared a report (the 1981 report). The 1981 report concluded that the Koppelman Process was technically, environmentally, and economically feasible.

SRI was formed in 1948 as Stanford Research Institute and is a leading research and development organization that provides research and consulting for business and government clients worldwide. Stone & Webster has a reputation as a leader in the engineering field with respect to the construction of large-scale plants.

In 1981, the DOE awarded to A.T. Kearney, an international consulting firm, a $1,603,480 grant for an alternative fuels feasibility study for K-Fuel. Koppelman received a subcontract from A.T. Kearney under the 1981 grant in the amount of $425,000.

By the summer of 1981, Koppelman, with the assistance of SRI and others, had built a model plant capable of producing K-Fuel in small quantities. The model plant was built at SRI's 70-acre research facility in Menlo Park, California. By this time, the Koppelman Process was covered by various U.S. and foreign patents.

On March 21, 1984, Koppelman sold a 20-percent undivided interest in the Koppelman Process to DSC Holdings, Inc., a wholly owned subsidiary of Diamond Shamrock Corp. (the Diamond Shamrock agreement) for $10 million. On the same date Koppelman sold an 80-percent undivided interest in the Koppelman Process to Theodore Venners for $90 million (the Venners agreement). The rights transferred by Koppelman pursuant to the Diamond Shamrock agreement and the Venners agreement were transferred subject to the rights held by POGA and SFA.

## II. *The Network*

In early 1981, Richard B. Basile (Basile) learned of Koppelman and the Koppelman Process. In March or April of 1981, Basile met with Koppelman. Shortly thereafter, an elaborate network of interrelated entities was formed to exploit the Koppelman Process. POGA and SFA were elements of this network.

Intro-Continental Investment, B.V. (Intro-Continental), owned all of the stock of Ronodo Corp., N.V. (Ronodo), which, in turn, owned all of the stock of Sci-Teck Licensing Corp. (Sci-Teck). In August 1981, Koppelman signed a document in which he purported to license Ronodo to produce K-Fuel. Ronodo sublicensed its rights to Sci-Teck, which, in turn, sublicensed its rights to POGA and SFA. On December 31, 1981, POGA and SFA entered into a joint venture to own, operate, and manage a pilot K-Fuel plant. On that date, POGA and SFA entered into separate research and development agreements with Fuel-Teck Research & Development, Inc. (FTRD), under which FTRD agreed to conduct and coordinate the research and development efforts of Koppelman, A.T. Kearney, and others for the benefit of SFA and POGA. FTRD was a wholly owned subsidiary of Petro-Syn Corp. (Petro-Syn).

SFA and POGA also entered into agreements with Chronometer Management & Consultants, Inc. (Chronometer), pursuant to which Chronometer was to render administrative services to the partnerships. The partnerships' attempt to develop the Koppelman Process was to be partially subsidized by investments in certain oil and gas wells. The partnerships' oil and gas activities were to be conducted by Fuel-Teck Oil & Gas, Inc. (FTOG), another wholly owned subsidiary of Petro-Syn.

### A. *Koppelman's License to Ronodo*

The August 1981 license agreement purportedly granted Ronodo the exclusive right to use the Koppelman Process in the State of North Carolina to refine wood and peat into K-Fuel. The agreement also purportedly granted Ronodo the exclusive right to use the Koppelman Process in the United States and certain other countries to refine bagasse into K-Fuel. The agreement explicitly did not grant Ronodo the

right to use the process to produce charcoal briquettes for cooking purposes.

In exchange for its rights under the agreement, Ronodo promised to pay a one-time license fee of $4 per estimated annual output ton for each Koppelman Reactor. No fee was payable for the first such reactor to be operated by Ronodo. Ronodo also agreed to pay, with certain restrictions and modifications, a 5-percent net royalty on substances produced through the Koppelman Process. Finally, Ronodo agreed to pay additional consideration of $1 million, contingent on the commercial viability of the first Koppelman Reactor. One-third of this amount was allocated to the "Peat License" and two-thirds to the "Bagasse License." The first of two addenda to the license stated that Ronodo would pay $1,600,000 for a Koppelman Reactor to be assembled by Koppelman in North Carolina. The addendum stated that a "down payment" of $640,000 would be paid by December 1, 1981, with a second "down payment" of equal amount to be paid on "April 30, 1981" [sic] and the balance on completion of the reactor's installation.

The license agreement consisted of 19 typewritten pages and (inserted between pages 9 and 10) 3 handwritten pages. Each typewritten page contained handwritten changes, additions, and deletions, none of which were initialed or otherwise validated. The 3 handwritten pages, which referred to the additional consideration of $1 million, were unsigned, uninitialed, and not referred to in the typewritten pages. The agreement bore Koppelman's undated, unwitnessed signature and no other. The first typewritten addendum to the agreement contained uninitialed handwritten alterations and was not signed or dated. The second typewritten addendum was dated and signed by Koppelman, and by an "attorney in fact," of Ronodo, whose name was illegible.

## B. Sci-Teck's License to SFA and POGA

Ronodo sublicensed its rights under the 1981 license agreement to Sci-Teck, its wholly owned subsidiary. On December 31, 1981, Sci-Teck entered into separate agreements in which it sublicensed certain rights to SFA and POGA. Sci-Teck's agreement with SFA granted SFA (i) the exclusive right to use the Koppelman Process with respect

to peat and wood in certain counties of North Carolina (the SFA exclusive area); (ii) the nonexclusive right to use the process at the North Carolina plant with respect to peat; (iii) the nonexclusive right to use the process with respect to peat and wood in the States and Territories of the United States (except the counties of North Carolina not within the SFA exclusive area); and (iv) the nonexclusive right to use the process with respect to any material other than bagasse in the States and Territories of the United States. Sci-Teck's agreement with POGA granted POGA the exclusive right to use the Koppelman Process with respect to wood and peat in all North Carolina counties not within the SFA exclusive area (the POGA exclusive area) and other nonexclusive rights identical to those conferred in Sci-Teck's agreement with SFA.

In their respective agreements with Sci-Teck, SFA and POGA each represented that it was a partnership in the process of making a private offering of between 125 and 250 partnership units. Each partnership agreed to pay Sci-Teck $112,175 for each SFA or POGA partnership unit sold, as follows:

| Date | Form | Amount per unit |
|------|------|-----------------|
| Upon commencement | Cash | $3,800 |
| | Partnership note due Oct. 1, 2006 | 16,500 |
| Oct. 1, 1982 | Cash | 2,700 |
| | Partnership note due Oct. 1, 2007 | 24,900 |
| Oct. 1, 1983 | Cash | 3,700 |
| | Partnership note due Oct. 1, 2008 | 33,000 |
| Oct. 1, 1984 | Cash | 2,775 |
| | Partnership note due Oct. 1, 2009 | 24,800 |
| | | 112,175 |

Each partnership thus agreed to pay between $14,021,875 and $28,043,750 for the rights licensed by Sci-Teck.

In October of 1982, SFA executed a full recourse promissory note payable to Sci-Teck in the amount of $1,805,250 due October 1, 2007. In October 1982, POGA executed a full recourse 25-year promissory note in the amount of $5,260,125 payable to Sci-Teck.

On its income tax return for 1981, SFA deducted $1,492,050 as a license fee to be paid to Sci-Teck. The amount represented accrual of the note and cash payments due to Sci-Teck on 73.5 units, determined as of the date the 1981 income tax return was prepared. On its income tax return for 1981, POGA deducted $4,288,375 as a license fee to be paid to Sci-Teck. The amount represented accrual of the note and cash payments due to Sci-Teck on 211.25 units, determined as of the date the 1981 income tax return was prepared.

On its 1982 income tax return, SFA deducted $1,980,700 as a license fee. On its 1982 income tax return, POGA deducted $5,830,500 as a license fee. These amounts represented the accrual of the cash and note payments due to Sci-Teck during 1982. For 1982, POGA also deducted $505,897 as interest expense and reported $428,455 as interest income on notes receivable.

## C. *FTRD*

FTRD was created for the purpose of overseeing the construction by Stone & Webster of a Koppelman Process plant. On December 31, 1981, SFA and POGA separately entered into identical research and development agreements with FTRD. In its agreements with the partnerships, FTRD promised to coordinate the activities of Koppelman, A.T. Kearney, and others for the benefit of SFA and POGA. SFA and POGA each agreed to pay FTRD $29,800 for each SFA or POGA partnership unit sold, as follows:

| Date | Form | Amount per unit |
|---|---|---|
| Upon commencement | Cash | $4,000 |
| | Partnership note due Oct. 1, 2006 | 16,500 |
| Oct. 1, 1982 | Cash | 1,000 |
| | Partnership note due Oct. 1, 2007 | 8,300 |
| | | 29,800 |

On its 1981 income tax return, SFA deducted $1,506,750 as a research and development fee to be paid to FTRD. This amount represented the accrual of the note and cash payments due to FTRD on 73.5 units. On its 1981 income tax return, POGA deducted $4,288,375 as a research and

development fee to be paid to FTRD. This amount represented the accrual of the note and cash payments due to FTRD on 211.25 units, determined as of the date the 1981 tax return was prepared.

On its 1982 income tax return, POGA deducted $1,964,625 as a research and development fee. On its 1982 income tax return, SFA deducted $653,750 as a research and development fee.

### D. *Chronometer*

SFA and POGA each entered into agreements with Chronometer pursuant to which Chronometer agreed to provide management and financial consulting services to the partnerships. For its services, Chronometer was to receive from the partnerships (i) 2 percent of the limited partners' 1981, 1982, 1983, and 1984 capital contributions, (ii) 2 percent of the partnerships' gross income from operations, and (iii) a fixed annual fee of $17,500, adjusted for inflation, plus expenses.

### E. *SFA and POGA*

SFA and POGA issued substantially identical offering memoranda. According to the memoranda, SFA and POGA each offered from 125 to 250 limited partnership interests. The subscription price of $161,500 per interest was payable in cash and promissory notes as follows:

| Form | Due | Amount |
|---|---|---|
| Cash | On subscription | $10,000 |
| Note in the principal amount of | Mar. 1, 1982 | 10,000 |
| $27,500 (payable in three | Mar. 1, 1983 | 10,000 |
| installments) | Mar. 1, 1984 | 7,500 |
| Note in the principal amount of | Mar. 1, 1993 | 24,000 |
| $124,000 (payable in five | Mar. 1, 1994 | 30,000 |
| installments) | Mar. 1, 1995 | 30,000 |
| | Mar. 1, 1996 | 30,000 |
| | Mar. 1, 2007 | 10,000 |
| Total | | 161,500 |

Investors in SFA and POGA also agreed to assume personally a proportionate share of the partnerships' liabilities to FTRD under the research and development agreements and the liabilities to Sci-Teck under the license agreements. The

assumption agreement signed by petitioners was limited to the principal amounts of these liabilities.

The memoranda stated that the partnerships were organized for the following purposes:

To devote a significant portion of initial cash proceeds to a program of developmental oil and gas drilling.

To reinvest a major portion of the early cash flow from initial drilling operations in order to maximize the number of partnership wells.

To exploit new technology by the construction and development of an experimental pilot plant (partially funded by the Department of Energy) to convert peat, wood, and other cellulosic materials into a new and theoretically clean and efficient synthetic fuel.

Each memorandum set forth tax losses anticipated for the first 4 years of the partnerships' operations. The memoranda contained a complete tax analysis and opinion, assurances of tax representation by Baskin & Sears, and the following caveat:

If an Investor does not, or is not able to, utilize such tax savings profitably, such Investor will not be able to derive the full intended benefit of investment in the Partnership.

The POGA memorandum identified Arthur Goldman (Goldman) as POGA's general partner and described him as follows:

*Arthur Goldman.* Mr. Goldman is a certified public accountant licensed in the State of New Jersey. Mr. Goldman has been a financial consultant since March 1980 to World Video Corporation, which is engaged in the business of producing video tapes for the medical field. He also is General Partner of Opthalmology Associates, a limited partnership which manufactures and distributes video cassettes and disks for use by the medical profession. From 1975 to 1980, Mr. Goldman was General Manager and Treasurer of Princeton Electronic Products Inc., which manufactures medical components. During 1974 Mr. Goldman acted as financial consultant to corporations in the telecommunications industry. Prior to 1974 Mr. Goldman was, among other things, General Manager of Plessey Communication Systems Corp., which manufactured and distributed telephone equipment, and Assistant Controller of Majestic Specialties Inc., a manufacturer of women's clothing.

The SFA memorandum identified Martin Kaye (Kaye) as SFA's general partner and described him as follows:

*Martin Kaye.* Mr. Kaye is an independent tax and financial consultant. Since January 1979 he has been a consultant to VAS in connection with

tax oriented investments. Mr. Kaye is also a consultant to Reliable. During 1978 he served as Vice President and Chief Financial Officer of Dia-Chem International, Ltd., a broker of plasma (human) chemistry control products. Mr. Kaye was a partner of Henry Warner & Company, a New York certified public accounting firm from 1968 through 1977. Mr. Kaye is a licensed certified public accountant in the States of New York and Illinois and is a member of the New York State Society of Public Accountants and the American Institute of Certified Public Accountants. In addition, Mr. Kaye is Vice President—Finance and a director of BIS Communications Corporation, which is engaged in providing business information at airport terminals. He also serves as Vice President—Finance of Goldtex Foods Corporation, a holding company that is engaged through its subsidiaries in retail baking and franchising. Mr. Kaye is a director of Sands Minerals Corporation (Canada) which invests in oil and gas programs.

The memoranda emphasized the difficulties of oil and gas development and the risks associated with research and development. The offering memoranda contained the following caveat:

The value of the Licensed Technology to the Partnership cannot be conclusively demonstrated. The license fee was not negotiated in an arm's-length transaction and it is possible that the Licensed Technology will prove not to have a value to the Partnership commensurate with its cost. Finally, were the title of Ronodo to any of the technology found to be invalid or were any of the patents found to be invalid or unenforceable or found to infringe technology of others, the Partnership would have to seek redress against Sci-Teck which has no significant assets or Ronodo, which is a foreign corporation with very limited assets and against whom suit might be difficult.

Only 10 percent of the funds contributed to the partnerships was to be allocated to working capital. Almost 70 percent was to be paid to promoters, attorneys, or network entities. According to the memoranda, the proceeds of the offering were to be applied as follows:

| | Per unit | | | | | Total | |
| Item | During 1981-84 | Percentage of 1981-84 payments | Out of long-term notes | Percentage of long-term notes | Percentage of total unit | Total for minimum offering | Total for maximum offering |
|---|---|---|---|---|---|---|---|
| Cash commissions and marketing fees | $5,625 | 15.00% | - - - | - - - | 3.49% | $703,125 | $1,406,250 |
| Management fee to general partner | 375 | 1.00 | - - - | - - - | 0.23 | 46,875 | 93,750 |

| | Per unit | | | | | Total | |
|---|---|---|---|---|---|---|---|
| Item | During 1981-84 | Percentage of 1981-84 payments | Out of long-term notes | Percentage of long-term notes | Percentage of total unit | Total for minimum offering | Total for maximum offering |
| Organizational expenses including legal and accounting fees | 1,125 | 3.00 | - - - | - - - | 0.70 | $140,625 | $281,250 |
| Fees to R & D | 5,000 | 13.33 | $24,800 | 20.00% | 18.45 | 3,725,000 | 7,450,000 |
| License fee to Sci-Teck | 12,975 | 34.60 | 99,200 | 80.00 | 69.46 | 14,021,875 | 28,043,750 |
| Oil and gas operations | 11,275 | 30.07 | - - - | - - - | 6.98 | 1,409,375 | 2,818,750 |
| Management fee to consultants | 750 | 2.00 | - - - | - - - | 0.46 | 93,750 | 187,500 |
| Working capital[1] | 375 | 1.00 | - - - | - - - | 0.23 | 46,875 | 93,750 |
| | 37,500 | 100.00 | 124,000 | 100.00 | 100.00 | 20,187,500 | 40,375,000 |

[1]Interest on the limited partners' short-term notes will be added to working capital. This interest is estimated at approximately $28,125 in 1982, $140,625 in 1983, and 189,845 in 1984 if 125 units are sold and $56,250 in 1982, $281,250 in 1983, and $379,690 in 1984 if all 250 units are sold. The general partner will seek to maintain working capital at $150,000 and will retain funds whenever it falls below that level in order to replenish it.

The memoranda stated that up to 85 percent of the net cash-flow generated by the oil and gas activities would be utilized to increase oil and gas holdings and to pay off the partnerships' notes to FTRD and Sci-Teck.

SFA prepared an analysis of expected revenues from the partnerships from gas and oil well drilling operations. POGA prepared a similar analysis of the projected revenues from its gas and oil well drilling operations. The projected revenues from gas and oil well drilling would have been sufficient to completely retire the partnerships' notes to Sci-Teck and FTRD both as to principal and interest.

The partnerships did not include financial projections as to the Koppelman Process in the offering materials because of concerns about applicable securities laws. The memorandum clearly warned, however, that financial success, in terms of K-Fuel development, was highly unlikely. Reasons cited included (1) commercially unproven technology; (2) lack of experience; (3) conflict of interests; (4) large obligations incurred without arm's-length negotiations; (5) environmental and health problems; (6) severe competition; and (7) inadequate capital (after payments to the promoters and their associates).

## III. *The Promoters and Their Agents*

### A. *Basile*

Basile was a promoter of energy-related limited partnerships. At some point in 1981, Basile discussed a possible K-Fuel project with Werner Heim of Zurich, Switzerland, with whom Basile had an ongoing relationship. Heim had placed well in excess of $1 million at Basile's disposal for various projects. Thereafter, Intro-Continental was formed, and for services rendered by Basile, he received a 15-percent interest in Intro-Continental and in its wholly owned subsidiary, Ronodo. In August 1981, Basile became chairman, chief executive officer, and president of Petro-Syn, in which he owned 35 percent of the outstanding stock as of both August 31, 1981, and December 31, 1981. For services to Petro-Syn, Basile was to receive $25,000 annually for 3 years. Basile also was secretary-treasurer and director of FTRD and of FTOG.

According to the partnership memoranda, Basile's personal interests conflicted with the interests of SFA, POGA, and the limited partners. Basile was president and chief executive officer of Genoco Industries, Inc. (Genoco), and a promoter of Petrogene Oil & Gas Associates (Petrogene). The partnership memoranda stated that Genoco would engage in oil and gas activities similar to those engaged in by FTOG, and that Genoco would convert bagasse into synthetic fuel. Petro-Syn, Sci-Teck, Ronodo, Genoco, and Petrogene were all entities in which Basile had a proprietary interest and which stood to profit at the expense of the partnerships. In approximately May 1982, Basile sold his interests in Intro-Continental and Petro-Syn to Ronodo for $650,000.

### B. *Gaskell*

Keith R. Gaskell (Gaskell) was one of the three principals of Chronometer. In early 1981, as general partner of Petrogene, Gaskell became familiar with the Koppelman Process. Gaskell devoted most of 1981 to the Petrogene project. Gaskell's interest in using the Koppelman Process for his Petrogene project involved bagasse as a fuel stock.

Gaskell had a background in engineering and management. In 1981, Gaskell discussed the Koppelman Process with Koppelman, SRI, Stone & Webster, and the DOE. Gaskell was attracted to the Koppelman Process by its low ash and sulfur content. During 1981, Gaskell believed that energy prices would continue to rise at a "real rate" of 4 percent. He believed that K-Fuel would be a cost-effective alternative to nuclear power, coal, and wood.

Gaskell employed Compunetics, Inc. (Compunetics), to review the profitability of the Koppelman Process. Compunetics prepared a report (the Compunetics report), in December of 1981, that concluded that the license fees to be paid to Sci-Teck were "well within the range of normal commercial practice." The Compunetics report was prepared by Dr. Samuel Hanna, a professor of mathematics and business at Boston University.

The Compunetics report concluded that, assuming that only one K-Fuel reactor tube were built, all of the notes due to Sci-Teck and FTRD would be fully paid by 1992. Assuming that one K-Fuel reactor tube were built, the Compunetics report concluded that the rate of return to a limited partner on a present value basis would be not less than 17 percent. The Compunetics report concluded that if a four-reactor tube plant were built, and 250 limited partnership units were sold, the rate of return to the limited partners would be over 55 percent. The report did not examine the validity of its underlying assumptions, i.e., it did not determine whether the construction of a K-Fuel reactor was financially or technically possible. (The Compunetics report was admitted for nonhearsay purposes only. Petitioners rely on the report to demonstrate that Gaskell took steps consonant with a bona fide profit objective.)

In 1981, Gaskell requested that Lawrence Kurland (Kurland) of Hubbell, Cohen, Stiefel, and Gross review all of Koppelman's patents. Kurland was a patent attorney. Kurland reviewed the patents and the file histories of the patents with respect to the K-Fuel process. He concluded that the scope of Koppelman's patents was fairly broad and not restricted in any meaningful way. Kurland advised the partnership that, of the various technologies that he had

investigated, the Koppelman Process had the best techno-
logical underpinnings. He concluded on the basis of his
investigation that investing in the Koppelman Process
involved a reasonable technical risk and that it was a sound
investment. (Kurland did not testify as an expert witness.
Petitioners rely on his testimony only to demonstrate that
Gaskell took steps consonant with a bona fide profit
objective.)

## C. *Rosenthal*

According to the partnership memoranda, Peter B.
Rosenthal (Rosenthal) was president of World Medical
Marketing Corp. which used limited partnerships to produce
and market medical video tapes. Rosenthal also was a
promoter and a consultant to Genoco. According to the
partnership memoranda, in 1975, Rosenthal was convicted
under 18 U.S.C. sec. 371 of conspiracy to commit securities
fraud. He was fined $10,000, served 4 months and 23 days
at Allenwood, Pennsylvania, and was placed on 1-year's
probation. Rosenthal was to be employed by Petro-Syn as a
consultant. For services to Petro-Syn, Rosenthal was to
receive $25,000 annually. At the time the partnerships were
formed, Rosenthal owned 35 percent of the outstanding
capital stock of Petro-Syn. Rosenthal also owned 15 percent
of the stock of Intro-Continental and Ronodo, the parent
company of Sci-Teck.

## D. *Aronson*

Sometime in 1980, James M. Aronson (Aronson) placed in
the Wall Street Journal a situation-wanted ad which came
to the attention of Rosenthal. In August 1980, Rosenthal
hired Aronson as a full-time employee of World Medical
Marketing Corp. Aronson worked for Gaskell, searching for
technology usable by Petrogene. At the same time, Aronson
worked for Basile, searching out potential energy projects
using the Koppelman Process. Aronson was attracted to the
Koppelman Process because it could be used with a variety
of feedstocks, as well as by the involvement of A.T.
Kearney, SRI, the DOE, and Koppelman. Aronson recom-
mended to the partnerships that North Carolina be chosen

as the site to build the K-Fuel demonstration plant based upon North Carolina's favorable climate, the availability of raw materials, and its proximity to coal burning utilities that were regulated by the "Clean Air Act." Ultimately, as the result of "consensus decision" by Basile and others, Aronson was sent to the site of a K-Fuel plant to be constructed in North Carolina "to be in visual contact with what was going on" and to report back to Basile.

In early 1982, Aronson arranged for a site to locate the North Carolina plant and negotiated an agreement to obtain a supply of peat for the operation of the plant. When the plant was under construction, Aronson briefly lived in a tent adjacent to the North Carolina construction site. From 1982 through 1984, Aronson engaged in a variety of projects related to coordinating the construction of the North Carolina plant. The North Carolina plant opened in early 1984.

Aronson had discussions with various potential purchasers of K-Fuel including Carolina Power & Light. When the price of energy leveled off, Aronson refocused his sales efforts away from the high demand, low margin electric utility market, to the low demand, high profit charcoal briquette market with the hope of obtaining a profit under changed economic conditions. On July 27, 1983, SFA and POGA were granted the exclusive right to use the Koppelman Process in the State of North Carolina to produce char for use in the manufacture of charcoal briquettes.

Aronson was a stockholder of Petro-Syn. The partnership offering memoranda stated that Aronson was to receive $35,000 annually for services to Petro-Syn. He was also president of FTRD. His annual salary from FTRD initially was $35,000; later it was increased to $50,000. He also received a bonus of between $10,000 and $15,000.

E. *Zukerman*

In 1981, Michael Zukerman (Zukerman) was a partner in Baskin & Sears, a New York law firm, specializing in corporate law. Basile, as promoter of the K-Fuel project and a client of Baskin & Sears, brought Zukerman into the project as legal counsel. Zukerman, in turn, brought in

Kurland. Zukerman, who had done legal work in a number of similar transactions, regarded himself as being in "the deal business." As such, Zukerman was brought into transactions by a promoter, such as Basile, with whom Zukerman had had a previous relationship. If the deal were not consummated, Zukerman would be paid by the promoter. If it succeeded, Zukerman would become counsel to the partnership and would be paid by the partnership.

Baskin & Sears prepared all promissory notes, contracts, and assumption agreements to be entered into by SFA, POGA, and their respective limited partners. None of these agreements was entered into at arm's length. Baskin & Sears owned 40 shares, or 4 percent, of the outstanding stock of Petro-Syn. The firm received payment for its services in the SFA/POGA project both from Intro-Continental and from Basile. Although Baskin & Sears looked upon Basile as "the client," the firm also represented Petro-Syn and the partnerships; the limited partners (investors) were not separately represented.

The "tax group" of Baskin & Sears rendered a tax opinion examining the SFA and POGA offerings and reviewed all pertinent documents to ensure that the transaction complied with section 465. Zukerman's understanding of the network was as follows:

It had to do with the tax structure, in order to accomplish the desired tax results, you have to have an independent licensor from a contract, and the partnership, in effect—there was a diagram in the private placement memorandum which directed the cash and knowledge, and the whole concept was to establish an independent contractor, that's where Petro-Syn fell in, and you needed an independent licensor. The various other parties around it, Verrilli, Altschuler & Schwartz was the broker-dealer, Chronometer was the management company, and you had outside contractors, A.T. Kearny, Stone & Webster, Celas and Peatco. And the structure was really a tax structure to accomplish the desired tax end.

## IV. *The Investors*

### A. *Petitioners Smith*

The Smiths became limited partners in SFA in December of 1981 by purchase of one unit. The Smiths invested in their limited partnership interest in SFA, pursuant to a schedule calling for payment as follows:

*Per unit.*

| | |
|---|---|
| $10,000 ..................... | Payable upon subscription to SFA |
| 10,000 ..................... | Due on Mar. 1, 1982 |
| 10,000 ..................... | Due on Mar. 1, 1983 |
| 7,500 ..................... | Due on Mar. 1, 1984 |
| 24,000 ..................... | Due on Mar. 1, 1993 |
| 30,000 ..................... | Due on Mar. 1, 1994 |
| 30,000 ..................... | Due on Mar. 1, 1995 |
| 30,000 ..................... | Due on Mar. 1, 1996 |
| 10,000 ..................... | Due on Mar. 1, 2007 |
| 161,500 | |

The Smiths' obligations to SFA were embodied in full recourse promissory notes. The Smiths made timely payments of principal for 1981, 1982, and 1983. Their 1984 principal payment was made in 1985. With Kaye's consent, the Smiths delayed until 1986 the interest payments due in 1982, 1983, and 1984.

On December 30, 1981, the Smiths entered into an agreement with Sci-Teck pursuant to which they agreed to assume personal liability for SFA's obligations to Sci-Teck in the total amount of $99,200. On December 30, 1981, the Smiths entered into an agreement with FTRD pursuant to which they assumed SFA's liability to FTRD in the total amount of $24,800.

In the statutory notice sent to the Smiths, respondent explained his disallowance of their share of partnership losses as follows:

It is determined that the amounts of $40,392.00 and $38,316.00 shown on your returns for the taxable years 1981 and 1982 as your distributive share of losses from the SYN-FUEL ASSOCIATES partnership are not allowable since it has not been established that the losses were incurred in connection with an activity engaged in for profit or in connection with a trade or business.

It is further determined that your investment in the SYN-FUEL ASSOCIATES partnership is lacking in economic substance other than the avoidance of tax.

It is further determined that no portion of the claimed losses from the SYN-FUEL ASSOCIATES partnership represents expenditures for research and development under the provisions of section 174 of the Internal Revenue Code of 1954.

Accordingly, your taxable income is increased $40,392.00 and $38,316.00 for the taxable years 1981 and 1982 respectively.

In the alternative, it is determined that—should any portion of the claimed losses from the SYN-FUEL ASSOCIATES partnership be

deemed allowable—said allowable portion is limited to the amount which was at risk under the provisions of section 465 of the Internal Revenue Code of 1954 during the taxable year; and that the amount which was at risk does not exceed the amount of your net cash investment in the SYN-FUEL ASSOCIATES partnership which was paid during the taxable year.

## B. *Petitioner Karr*

Karr and Robert H. Bluhm (Bluhm) became limited partners of POGA in December of 1981 by purchasing one unit as tenants in common. For purposes of this case, Karr will be deemed to have purchased a one-half unit of POGA. Bluhm is not a party to this proceeding. Because Karr purchased only a one-half unit of POGA, his liability was as follows:

*Per one-half unit*

| | |
|---|---|
| $5,000 .................... | Payable upon subscription to POGA |
| 5,000 .................... | Due on Mar. 1, 1982 |
| 5,000 .................... | Due on Mar. 1, 1983 |
| 3,750 .................... | Due on Mar. 1, 1984 |
| 12,000 .................... | Due on Mar. 1, 1993 |
| 15,000 .................... | Due on Mar. 1, 1994 |
| 15,000 .................... | Due on Mar. 1, 1995 |
| 15,000 .................... | Due on Mar. 1, 1996 |
| 5,000 .................... | Due on Mar. 1, 2007 |
| 80,750 | |

Karr's obligations to POGA were embodied in full recourse promissory notes. Karr timely made all of the payments due to POGA between 1981 and 1984, including interest.

On December 29, 1981, Karr entered into an agreement with Sci-Teck whereby he agreed to assume personal liability for POGA's obligations to Sci-Teck in the total amount of $49,600. On December 29, 1981, Karr entered into an agreement with FTRD whereby he assumed POGA's liability to FTRD in the total amount of $12,400.

In the statutory notice sent to the Karrs, respondent explained his disallowance of their share of partnership losses as follows:

It is determined that the activity in which the partnership was engaged was not entered into for a profit. Accordingly, the income shown on the returns is adjusted in accordance with IRS section 183.

It is determined that the amount of $505,897 shown on your return for 1982 as interest expense is not allowed because the liability on which it is based is contingent in nature and the notes lack economic substance.

It is determined that the amounts shown are disallowed in full because it has been determined that the partnership activity was not entered into for a profit within the meaning of IRS section 183.

It has been determined that the partnership activity was not engaged in for profit, and accordingly, no investment credit is allowable with respect to any property acquired by the partnership.

## V. *The Experts*

### A. *Lam*

Jeffrey Lam (Lam), petitioners' first expert witness, submitted a report examining the oil and gas investments of SFA and POGA. Lam is an engineer registered in Texas. He holds a bachelor of science degree in petroleum engineering from the University of Texas, and he is president of Newington Petroleum Consultants, Inc., a firm that appraises oil and gas properties.

In his report, Lam examined the assumptions used by SFA and POGA to calculate the projected production, revenues, and cash-flow set forth in the offering memoranda. Lam concluded that the assumptions used by the partnerships were reasonable and consistent with industry practice. He opined that the projections of production and net revenue set forth in the memoranda were acceptable and reasonable.

### B. *Pomerantz*

Martin L. Pomerantz (Pomerantz), petitioners' second expert witness, submitted a report examining the market potential of K-Fuel slurries. Pomerantz is an engineer registered in Pennsylvania. He holds a Ph.D. degree in mechanical engineering from the University of Pittsburgh, and he is executive vice president of Fuels Utilization Research Institute, a firm that develops co-generation and fuel conversion programs.

In his report, Pomerantz examined slurry fuel technology and boiler retro-fit information available in 1981. Based on this information, and in light of 1981 oil price forecasts, Pomerantz concluded that in 1981 it would have been

reasonable to predict a 1985 K-Fuel market of 520,000 tons
of K-Fuel per year in North Carolina alone.

## C. *Plummer and Thomas*

James L. Plummer (Plummer) and Thomas C. Thomas
(Thomas) prepared the final expert witness report submitted
by petitioners. Plummer holds a Ph.D. degree in economet-
rics from Cornell University and is the author of numerous
books concerning the economics of energy and venture
capital formation. Thomas holds a Ph.D. degree in econom-
ics from the Massachusetts Institute of Technology. In
their report, Plummer and Thomas examined whether SFA
and POGA had reasonable prospects for profitability in 1981.
The report also discussed whether the price paid by the
partnerships for licensing the Koppelman Process corre-
sponded to reasonable fair market value.

In determining whether SFA and POGA had reasonable
prospects for profitability in 1981, Plummer and Thomas
drew upon a wide variety of sources to estimate the capital
and operating costs of commercial K-Fuel plants. Plummer
and Thomas assumed that the partnerships would not
internally finance full-scale commercial operations, but
would instead form a joint venture with an electric utility in
the region. Relying on a variety of assumptions concerning
the division of profits between the partnerships and their
joint venture partner, Plummer and Thomas concluded that
the partnerships could achieve a pre-tax internal rate of
return in excess of 25 percent. If the K-Fuel were marketed
as a component of an oil slurry, the partnerships' rate of
return could have exceeded 40 percent. Plummer and
Thomas concluded that SFA and POGA had reasonable
prospects of profitability in 1981.

In determining whether the price paid by the partnerships
for licensing the technology was reasonable, Plummer and
Thomas compared the rate of return sought by the partner-
ships to that sought by Occidental Petroleum in a much
larger and riskier shale oil project in Colorado. The report
then compared the price paid by the partnerships with that
paid by Diamond Shamrock Corp. and Theodore Venners in
1984. Finally, the report compared the price paid by the
partnerships to that paid by Ronodo to Koppelman. The

report concluded that the two to one step-up in price from the Ronodo purchase to the purchase by the partnerships was a reasonable cost for the syndication of risk among a large pool of investors. Plummer and Thomas opined that "the agreement between the Limited Partnerships and Sci-Teck was within the range of fair market values."

OPINION

Respondent has conceded that petitioners may deduct their distributive shares of partnership losses attributable to oil and gas investments and may use their distributive shares of any credits attributable to those oil and gas investments. The only deductions in issue, therefore, are the partners' distributive shares of losses represented by payments to Sci-Teck for license fees and to FTRD for research and development, including interest claimed by POGA and disallowed in the statutory notice sent to the Karrs. The parties agree that the claimed losses are deductible only if incurred in an activity engaged in for profit and, specifically with respect to the research and development expenses, in connection with a trade or business. Respondent also asserts other grounds for disallowing the deductions to the extent that they are based on notes, rather than cash. The parties disagree about who has the burden of proof on respondent's alternative arguments in the Karrs' case. If, however, we decide that the partnerships, and consequently petitioners, are not entitled to any deductions, we need not reach the grounds for disallowing deductions not represented by cash payments.

## Profit Objective and Economic Substance

Determination of whether an activity is undertaken for profit is generally referred to as involving a "section 183 issue." Section 183 initially served to distinguish between business objectives and personal objectives, but in recent years has been used frequently to compare business objectives with tax objectives. See generally *Brannen v. Commissioner,* 78 T.C. 471, 506-507 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Jasionowski v. Commissioner,* 66 T.C. 312, 321 (1976). In *Rose v. Commissioner,* 88 T.C. 386, 414 (1987), on

appeal (6th Cir., Dec. 14, 1987), we adopted a unified test of economic substance incorporating factors considered relevant in cases decided under section 183. The *Rose* approach was a restatement of prior law, particularly identifying objective factors examined under various theories by which respondent challenges the tax treatment of transactions. "Reliance on these objective factors enables us to focus our scrutiny on the actual mechanics of the transactions, rather than on an ephemeral analysis of subjective intentions." *Rybak v. Commissioner*, 91 T.C. 524, 535 (1988).

The unified approach of *Rose* is applicable in cases involving "generic tax shelters," which we there identified as cases having certain characteristics making tax motivation apparent. Those characteristics are:

(1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * * [88 T.C. at 412.]

Once tax motivation is apparent, we must determine "whether sufficient business purpose existed for the taxpayer to obtain the claimed tax benefits." 88 T.C. at 412. We also noted in *Rose:*

We do not rely on or incorporate the definitions of "tax shelter" set forth in sec. 6661(b)(2)(C), adopted by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L, 97-248, sec. 323(a), 96 Stat. 324 (applicable to returns for which the due date is after Dec. 31, 1982) or sec. 6111(c), added by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 141(a), 98 Stat. 494, 682 (with respect to investments sold after Aug. 31, 1984). Such definitions create "statutory tax shelters." * * * [88 T.C. at 407 n. 2.]

\*        \*        \*        \*        \*        \*        \*

Generic tax shelters are distinguishable from statutory tax shelters (see note 2 *supra)* and other specific types of tax-preferred activities, such as real property, equipment leasing activities, and oil and gas ventures. See *Estate of Baron v. Commissioner*, 83 T.C. 542, 552 (1984), affd. 798 F.2d 65 (2d Cir. 1986). [88 T.C. at 413 n. 5.]

After concluding that the arrangement involved in *Rose* was a generic tax shelter, we analyzed the transaction and determined that it lacked economic substance. We recognized, however, that Congress has created deductions and investment tax credits to encourage certain types of activities, and the taxpayers who engage in those activities are entitled to the attendant benefits. 88 T.C. at 421. See also *Fox v. Commissioner,* 82 T.C. 1001, 1021 (1984).

The limited partnerships in issue here, with respect to the Koppelman Process activity, have the characteristics generally shared by generic tax shelters. (1) The private placement memoranda emphasized tax benefits, specifically stating that persons not in the maximum tax brackets could not obtain the full advantages of the investment. (2) Petitioners concede that they did not engage in price negotiation. (3) The assets in question, consisting of limited rights to exploit the Koppelman Process in North Carolina, were, according to all of the experts, difficult to value. (4) There were no tangible assets involved, but the partnerships paid a multiple of the price contemporaneously paid by the licensor. (5) The bulk of the consideration was deferred by promissory notes; although the notes were recourse in form and may have been enforceable, the substantive liability that they represented was far less than the face amount of the notes.

Although these characteristics do not coincide precisely with those involved in *Rose,* the factors considered in *Rose* are usefully considered here. Those factors were directly derived from prior cases in which economic substance was examined, including cases in which the result of such examination was to recharacterize a transaction without entirely disregarding it. 88 T.C. at 410-411. See *Rybak v. Commissioner, supra.* The characteristics attributed to generic tax shelters in *Rose* merely serve to identify transactions in which tax motivation is apparent. Any doubt that tax motivations shaped the limited partnership transactions in issue here was dispelled by the testimony of Zukerman, summarized above and quoted at length below.

The oil and gas activities of the partnerships were expressly excluded from the category of generic tax shelters in *Rose v. Commissioner,* 88 T.C. at 413 n. 5. Such

activities are commonly recognized as congressionally en-
couraged by tax incentives. In any event, respondent has
conceded deductions and credits relating to those activities.
Thus we cannot conclude that the partnerships totally
lacked economic substance. The question remains: What, if
anything, was the economic substance of the Koppelman
Process activity of the partnerships? Specifically, were these
partnerships engaged in the trade or business of developing
energy sources from the Koppelman Process or were they in
the business of financing the operations of other entities in
exchange for tax benefits?[2] The business activities of other
entities directly involved in exploiting the Koppelman
Process will not necessarily be attributed to the limited
partnerships in which petitioners invested. See *Beck v.
Commissioner*, 85 T.C. 557, 580 (1985).

Whether we are determining the existence of a profit
objective or the status of an activity as a trade or business,
we examine the appropriate factors at the partnership level.
*Brannen v. Commissioner, supra; Madison Gas & Electric
Co. v. Commissioner*, 72 T.C. 521, 564-565 (1979), affd. 633
F.2d 512 (7th Cir. 1980). Citing *Surloff v. Commissioner*, 81
T.C. 210, 233 (1983), petitioners specify that "in determin-
ing whether the Partnerships had the requisite profit motive
it is necessary to look at the motive and objectives of the
promoters and managers of the Partnerships." We do so in
detail below.

*The dealings between the partnerships and the other net-
work entities.*

The general partners were tax and financial professionals
and had no technical background relevant to exploitation of
the Koppelman Process. Neither general partner testified at
trial, although Kaye, at least, was present at the commence-
ment of the trial and available to testify. The parties
stipulated that the general partners relied entirely on others
to conduct the Koppelman Process activity of the partner-
ships.

Those others, of course, included Basile, Gaskell,
Aronson, and the lawyers who designed the structure of
entities and drafted the documentation. The most revealing,

---

[2]See *Chung v. Commissioner*, T.C. Memo. 1986-131.

and therefore persuasive, evidence of the relationship among the various parts of the network was the candid testimony of Zukerman. See *Ewing v. Commissioner*, 91 T.C. 396 (1988). We therefore quote that testimony at length. Zukerman stated that the structure was chosen to accomplish the desired tax end, as set forth in our findings of fact, page 748, *supra*. On further examination by petitioners' counsel, he elaborated as follows:

Q. Going back to the structure for a minute, were there any other reasons that this structure was used, other than tax reasons?

A. I'm not sure I understand the question. Are you talking specifically about how it was outlined? * * *

Q. Well, was there any particular reason why Ronodo was in this transaction?

A. * * * there were a bunch of projects taking place at that time. There was a substantial amount of money required, and in order to feed, primarily the Petrogene project, it was in excess of $1 million, the—Richard [Basile] approached some people to put up some money. He had a prior relationship with a man in Zurich by the name of Werner Heim, who introduced him to the money. And then in exchange for that, — Richard [Basile] and Peter [Rosenthal] got a percentage interest in the licensor and they retained a substantial interest in the contract of Petro-Syn. And the way it was set up is, Fuel-Teck O&G was to receive substantial sums of money, they got a carried working interest of 12.5 percent and an AFE contract of 15 percent for work done in O&G and they got additional, because they owned an interest in R&D, and the feeling was that there was a substantial amount of money to be made with R&D, their real profit was to be in Petro-Syn and they had a smaller share of what was going to take place in Ronodo.

\* \* \* \* \* \* \*

Q. And these people in Europe are the ones who provided the $1 million that you talked about?

A. Yes, it was in excess of $1 million for the Petrogene project, for the peat project and for another project they were working on which ultimately didn't go forward.

Q. And these people in Europe are the ones who negotiated this particular structure or—

A. No. They were putting up money. They were putting up money and, therefore, they were buying the license and, in effect, taking the true venture capital risk which was to fund these different transactions. And a perfect example is, they funded over $1 million into Petro-Syn—into Petrogene and it fell apart, no money was ever made. So, they lost way in excess of $1 million on Petrogene because the deal never went forward. They lost money in Sonic, the transaction never went forward. The only money that was made was in this transaction, and what they did was, they funded it. So that transaction was an independent license agree-

ment, in which this money was funded and there was a tax plan in order to get the license income for the offshore investors.

Then, the domestic operation was set up to, in effect, operate the business because the partnership was passive. So, you had to retain certain people to operate the business. You had the grant, the Department of Energy grant, and the Department of Energy grant there was a number of people involved in that part of the project that would be A.T. Kearny, who was actually granted the grant, Stone & Webster was one of the contractors, and SRI, who was brought in as a consultant to Ed Koppelman. And that—so, those people were working on the grant itself.

The Petro-Syn group was to fund the operation. Now, let me, for example, take you through. The concept of the structure was that the investor would go in and take a venture capital risk in the R&D, research and development, but the oil and gas was developmental oil and gas drilling, so, by doing the oil and gas drilling, it was anticipated that the down side would be covered by relatively safe investments in oil and gas. And by constantly reinvesting, the concept was if you reinvested in the oil and gas programs, then you would almost eliminate the risks that would take place in the research and development area.

So, it was set up in such a way that somebody would do it. The experience of the people, there were some substantial—there was substantial experience at the Petro-Syn level, much more experience than there was in the general partner or in anybody else involved in the project.

Q. Going back a minute to the licensor, were there negotiations carried on with these people in Europe as to the license fees that the partnership would carry on and pay and so forth?

A. Well, it had to do with the valuation issue. Obviously, they were businessmen trying to get as much money as they possibly could. The key ingredient was the return on investment. You had to have a realistic return on—in other words, when you took the information from Stanford Research Institute and then you applied mathematical formulas to it, you came up with a return on investment. That return on investment had to fit within certain parameters in order to be a venture capital transaction. If it weren't in the very high ranges, it would not entice people to invest in it. So is the concept of venture capital: You had a high risk with a high reward.

In those times, there were — you know, all of us were kind of caught up in it. There was a real feeling that we had hit upon some things and it was exciting to be involved in the projects. The Petro-Syn project—the Petrogene project we all thought was potentially a revoluntionary project. The K-Fuel project, although not as revoluntionary, had some very, very exciting potential. And in those days, it was the way to raise money, you couldn't do it in the stock market as easily as you could here. So, when you did a transaction such as this, you had a high risk, high reward transaction.

Petitioners contend that Zukerman's testimony must be considered in the context of what he said during cross-examination, which was:

Q. You stated on your direct testimony that part of the reason for structuring the transaction with a foreign corporation was to accommodate certain—to create certain tax benefits?

A. Yes.

Q. To create certain tax benefits for whom?

A. As far as we were concerned? For the partnership. I'm not sure I understand the question, though.

Q. Well, I mean, there was this foreign corporation there and I was wondering whose tax interests were being served by having this offshore corporation.

A. In that instance, I would assume the offshore people. In other words, if the people were off shore, they had certain tax goals to accomplish for themselves, I was not involved in their structure. We had a similar structure in Petrogene, they had been advised in that transaction and that structure, that overlay was given to us. All right?

Taking all of this testimony in context, we conclude that the limited partners were to provide cash to finance the activities of the promoters for their various projects, including, notably, Petrogene. In return, the investors would get tax benefits.

*Relationship between fees paid and fair market value.*

The license fee paid by the partnerships and the purported research and development fees paid to FTRD, as well as all fees paid for services by the individuals, were based on the number of units in the partnerships sold. This is a very strange way to run a trade or business. Ronodo's agreement with Koppelman, by contrast, called for payments to be made on the basis of actual output. The only expert testimony on the subject of the reasonableness of fees was from petitioners' experts, Plummer and Thomas, that the price paid for licensing the technology was "within the range of fair market value."

There is no proof of the value of the services performed by FTRD under its agreement. The fees were not set by arm's-length dealing. Basile was asked on examination by petitioners' counsel about the difference in valuation between the license arrangement between Koppelman and Ronodo, on one hand, and between the partnerships and Sci-Teck, a subsidiary of Ronodo, on the other. He explained:

THE WITNESS: On one hand, you mentioned the value, different valuation or price or cost of the license. In the case of Koppelman to Ronodo, you had pure investment capital, with no guaranteed return or tremendous risk that was involved, there was absolutely no guarantee whatsoever of any income accruing to Ronodo. Therefore, this was initial seed capital and they were expending tremendous sums of money and could be called upon to expend tremendous sums of money; so, therefore, their risk-to-reward ratio should be commensurately much higher. Once that had been established and all these mechanisms had been put in place, their licensing to the partnership, Ronodo's licensing to the partnership was predicated on the amount of units sold. So, therefore, Ronodo could have conceivably received zero income to many times above that, like a substantial sum of income.

So, therefore, the answer to that is that there should be a difference in price based on the fact that one was exceedingly risk-oriented, while the other one was based on return of—you know, return on capital.

On cross-examination, he was asked about the prices set for units in the limited partnerships. His testimony proceeded as follows:

Q. Who set those amounts?

A. That was with discussions with tax counsel and with people from Ronodo that Mr. Heim had expressed an interest of what he would have liked to have received, and also the fact that what we had computed to be—to make the project economically viable, that certain amount of—you know, the funds that would have to be expended to make a viable business project.

Q. Was it not the intention that if all of the units being offered were subscribed for, that there would be enough money to pay for all of the leg work and expenses that you had done?

A. Yes, sir.

Q. What then was the money to be put up by this Swiss entity needed for?

A. If the units—as I mentioned in my earlier testimony, sir, standby capital, if the units did not sell, if it required more exhaustive research or if moneys had to be expended which—before a sale of a single unit took place, that was pure risk capital. So, as I said, they had agreed to provide standby capital, so that if everything went—if things went awry, their money was on complete call, similar to, let's say, like a letter of credit, that is, a guarantee against any losses that everybody would incur.

Obviously, pricing was based on the need for capital from passive investors and not on the value of the license received from Sci-Teck or the services to be performed by FTRD.

The offering materials predicted that of the funds received by the partnerships from 1981 through 1984, approximately 30 percent would be applied to oil and gas operations. Almost 35 percent would be paid to Sci-Teck as license fees, and 13.33 percent would be paid to FTRD. More than 20 percent would be paid as commissions and marketing fees, management fees, and organizational expenses including legal and accounting fees. Although the amount left for working capital is small, there is little need for working capital in an entity that merely takes in and pays out money. This structuring was not necessarily detrimental to the partnership, because it was not required to pay out any more than it took in. Although the Koppelman Process activity was ultimately a failure, we cannot conclude that the partnership was necessarily doomed to losses from the agreements that it entered into. Examination of the relationship between the prices paid and fair market value, therefore, does not entirely negate economic substance. It does, however, suggest that the substance was a capital investment partnership rather than an active business to which the license fees and research and development fees were connected.

*Structure of the financing.*

We frequently compare the face amount of the notes given as consideration with the amount claimed as a current tax deduction to determine the economic reality of the transaction. See *Waddell v. Commissioner,* 86 T.C. 848, 910-912 (1986), affd. 841 F.2d 264 (9th Cir. 1988); *Karme v. Commissioner,* 73 T.C. 1163, 1186-1187 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); *Golsen v. Commissioner,* 54 T.C. 742, 753-754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Even if there is genuine indebtedness and economic substance to a transaction, we must still determine whether the form in which the transaction was cast was inconsistent with its true nature. *Packard v. Commissioner,* 85 T.C. 397, 419 (1985).

It appears to us that the deferred nature of the obligations to Sci-Teck and FTRD is indicative of the lack of substance of those transactions. The evidence does not suggest any business reason why payments for license fees

and to fund research and development would be postponed 25 years into the future. By its nature, research and development should be funded as quickly as possible so that the research can be completed and the results put into operation. Until that research and development has been accomplished and the results tested, the rights under the license would be useless. The K-Fuel venture was presented as totally speculative and justified and as meeting an immediate need for energy. A binding agreement to pay substantial and fixed amounts far in the future without regard to the success of this venture simply does not make sense from a business standpoint. Inadequate current funding would guarantee failure. This structure of financing, therefore, constitutes evidence that the activity was not conducted in a businesslike fashion. See *Ferrell v. Commissioner,* 90 T.C. 1154, 1185-1190 (1988).

Respondent disallowed the Karrs' proportionate share of interest deducted on POGA's return. The assumption agreements covered principal only. Even assuming that the assumption agreements were valid, there is every reason to believe that the partnership would never have funds available to pay the interest on the notes. The interest, therefore, is too unlikely to be paid to be deducted on an accrual basis. See section 1.461-1(a)(2), Income Tax Regs., and cases cited in *Rose v. Commissioner,* 88 T.C. at 420-421, 423-424.

## Perceived Congressional Intent

The tax benefits purportedly to be obtained with respect to the limited partnerships were predicated on the deductibility, under section 174, of the accrued payments to Sci-Teck and FTRD. For expenses to be deductible under section 174, it is not necessary that they be incurred "in carrying on" a trade or business, as required under section 162. It is only necessary that they be incurred "in connection with" the partnerships' trade or business. The less stringent "in connection with" standard is intended to stimulate the search for new products. *Snow v. Commissioner,* 416 U.S. 500 (1974).

Petitioners assert "The expenditures by the Partnerships to develop a process which would help to further the

national goal of energy independence and a clean environment was clearly within the purview of Congress' intent." Petitioners then correctly summarize the law and attempt to distinguish the facts in this case from those in cases adverse to the taxpayers as follows:

In *Snow* the Supreme Court overturned those decisions which had held that research and experimental expenditures by a taxpayer not currently engaged in a trade or business were nondeductible, pre-opening expenses. *Levin v. Commissioner, supra* [87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987)]. The Tax Court has held, however, that *Snow* did not completely eliminate the trade or business requirement. *Green v. Commissioner,* 83 T.C. 667, 686, 687 (1984). The Court in *Green* held that in order for an expense to be deductible under Code Section 174 the taxpayer must still be engaged in a trade or business "at some time." As stated in *Levin v. Commissioner, supra,* the test is, "whether the partnerships were engaged, at any time, in a trade or business in connection with which funds were expended for research and experimentation." In both the *Levin* and *Green* cases the Court found that the limited partnerships neither intended, nor were capable of ever engaging in a trade or business. Furthermore, each partnership's role was restricted by design to that of a passive investor.

In *Levin v. Commissioner, supra,* the Tax Court found that a party other than the partnership had through a series of contracts "insured that it retained effective control over the development, manufacture, use, and marketing of the machinery [which was the subject of the research and development effort] for its probable commercial life." Likewise in *Green,* pursuant to a prearranged plan, the partnership would never be able to produce or market the inventions that were the subject of the research and experimental expenditures, and were only entitled to collect royalties due under certain prearranged license agreements.

The present case is clearly distinguishable from *Green* and *Levin.* The Partnerships had no agreements, pre-existing or otherwise, for the sale or marketing of K-Fuel plants or the rights to build K-Fuel plants. Furthermore, they had no pre-existing contracts with any parties to manufacture K-Fuel plants. Instead, the Partnerships intended to build and finance additional K-Fuel plants, and sell K-Fuel to end users. Thus, unlike the Partnerships in *Levin,* the Partnerships were not precluded from actively engaging in a trade or business.

Respondent, however, quotes the following language from *Levin v. Commissioner,* 832 F.2d 403 at 406:

The concept of "trade or business" is plastic, [citation omitted], but it hardly follows that anything goes. The taxpayers take a "magic words" approach to the subject: if the partnership's documents contain the right language, then all is well. The Tax Court looked past the documents to the expectations of the parties at the time. It asked whether the

partnerships reasonably anticipated availing themselves of the privileges they possessed on paper. That is the right question; pen and ink divorced from reasonable business expectations do not a "trade or business" make. * * *

Respondent emphasizes criteria from the cases that hold that, for section 174 to apply, the taxpayer must be in a trade or business at some time, even though there are currently neither sales nor production. After analyzing a series of cases including *Snow v. Commissioner,* 416 U.S. 500 (1974), and citing *Levin v. Commissioner,* 87 T.C. 698 (1987), affd. 832 F.2d 403 (7th Cir. 1987), the Supreme Court has definitively stated:

We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity * * * does not qualify. [*Commissioner v. Groetzinger,* 480 U.S. 23, 34 (1987).]

Passive investment and delegation of business responsibilities to others do not constitute a trade or business, particularly where the conduct of the enterprise and its managers is not businesslike. See *Drobny v. Commissioner,* 86 T.C. 1326, 1343-1348 (1986).

We are not persuaded by petitioners' attempt to distinguish this case from *Green v. Commissioner,* 83 T.C. 667 (1984), and *Levin v. Commissioner, supra.* Actual control rested in persons whose compensation from these partnerships depended *solely* on capital contributions, while they had interests in the *profitability* of competing ventures. The rights of the partnerships to exploit the Koppelman Process in North Carolina are a minute fraction of the rights of the other network members to exploit the Koppelman Process throughout the world. It strains credulity to suggest that their loyalties would flow to the benefit of these partnerships. The offering memoranda cautioned about their conflicts of interest and warned the investors that:

were the title of Ronodo to any of the technology found to be invalid or were any of the patents found to be invalid or unenforceable or found to infringe technology of others, the Partnership would have to seek redress against Sci-Teck which has no significant assets or Ronodo, which is a foreign corporation with very limited assets and against whom suit might be difficult.

Obviously the partnerships had no effective recourse against or control over their purported agents and licensor.

Comparing, therefore, these facts with the salutary congressional intent reflected in section 174, it seems appropriate to incorporate our comment in *Beck v. Commissioner*, 85 T.C. 557, 579-580 (1985), that:

> In summary, it is apparent that bona fide business enterprises, [presumably those directly involved in developing the Koppelman Process] * * * may find a sideline of marketing tax benefits to provide a useful means of raising venture capital. [See the testimony of Zukerman, *supra*.] To some extent tax incentives, such as [sec. 174] * * * are designed to stimulate the formation of venture capital. Such incentives are not intended, however, to create a new economy consisting of paper transactions having no relationship to the real value of goods and services. Thus, the mere presence of a valid business enterprise at some levels of a transaction does not automatically entitle passive investors distant from day-to-day operation of the enterprise to the associated tax benefits. * * *

## Conclusion

Upon consideration of the above factors, we conclude that the partnerships' Koppelman Process activity was not a trade or business, lacked economic substance, and was not within the contemplation of Congress in enacting section 174. The partnerships are not entitled to the deductions claimed.

### Section 6659

Because the additions to tax under section 6659 were raised in amended answers, respondent bears the burden of proof as to the applicability of the addition to tax for a valuation overstatement. Under section 6659(c), a valuation overstatement occurs where the claimed value of property or its adjusted basis is 150 percent or more of the value or adjusted basis determined to be correct. The addition to tax applies only to an underpayment attributable to a valuation overstatement. See generally *Soriano v. Commissioner*, 90 T.C. 44, 61 (1988); *Todd v. Commissioner*, 89 T.C. 912 (1987), on appeal (5th Cir., Jan. 26, 1988); *Zirker v. Commissioner*, 87 T.C. 970, 980-981 (1986).

In this case, respondent contends that the underpayments are attributable to valuation overstatements because "there

were claims made by the petitioners on their respective income tax returns of adjusted bases in their respective partnership interests which exceeded 300 percent of the correct amount of such adjusted basis." Assuming, as the parties do, that an addition to tax under section 6659 may be based on an implied representation of partnership basis when deducting partnership losses, respondent has not satisfied his burden of proof.

First, we are not persuaded that petitioners' assumption agreements may be totally disregarded, although the limitation to principal and the remoteness of payment permitted us to conclude that they did not represent substance consistent with the tax benefits claimed. See *Abramson v. Commissioner*, 86 T.C. 360, 373-375 (1986); *Smith v. Commissioner*, 84 T.C. 889, 908 (1985), affd. without published opinion 805 F.2d 1073 (D.C. Cir. 1986). Respondent argues that the agreements are unconscionable and unenforceable under New York law and are lacking in consideration. Only hindsight, and no evidence existing as of the dates of the transactions, supports these arguments. Second, the only evidence of the likelihood that the notes would be paid was petitioners' expert testimony that they could be paid from operations. Third, respondent has not explained or proven the effect of adjustments to petitioners' bases in their partnership interests that would be made as a result of the oil and gas transactions conceded by respondent.

We have disallowed the research and development and interest deductions in issue because we have concluded that the partnerships were not in a trade or business that would support the deductions claimed, and the Koppelman Process activity lacked economic substance. See *Ferrell v. Commissioner*, 90 T.C. 1154 (1988); *Zirker v. Commissioner*, 87 T.C. at 980-981. Any underpayments, thus, are not attributable to a valuation overstatement.

## Section 6661

With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax on any underpayment attributable to a substantial understatement of income tax. Section 6661(b)(1) defines a substantial understatement of income tax as an understatement exceeding

the greater of 10 percent of the tax required to be shown on the return for the year or $5,000. The amount of the understatement is computed in accordance with the following provisions of section 6661(b)(2)(B) and (C):

(B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM.—The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

(C) SPECIAL RULES IN CASES INVOLVING TAX SHELTERS.—

(i) IN GENERAL.—In the case of any item attributable to a tax shelter—

(I) subparagraph (B)(ii) shall not apply, and

(II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

(ii) TAX SHELTER.—For purposes of clause (i), the term "tax shelter" means—

(I) a partnership or other entity,

(II) any investment plan or arrangement, or

(III) any other plan or arrangement,

if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

As of its effective date, section 6661(b)(2)(C) creates one category of "statutory tax shelters" referred to in *Rose v. Commissioner*, 88 T.C. at 407 n. 2.

After respondent sent the notices of deficiency involved in these cases, the rate of the addition to tax under section 6661(a) was increased from 10 to 25 percent. See *Pallottini v. Commissioner*, 90 T.C. 498 (1988). Petitioners Karr assert, and respondent does not dispute, that any addition to tax due from them under section 6661 is limited to 10 percent of the underpayment because respondent has not made claim for the increased amount.

Petitioners deny that the partnerships are tax shelters within the meaning of section 6661(b)(2)(C). We are satisfied on the record that the principal purpose of the Koppelman Process arrangements between the limited partnerships and the other entities in the network was the avoidance of

Federal income tax. Zukerman's testimony is the primary evidence on this matter. Our analysis of factors leading to the conclusion that the Koppelman Process activity did not have economic substance also supports this conclusion. The understatement, of course, will be reduced from that initially determined by respondent because of his concession of oil and gas related deductions and credits.

Petitioners do not contend that they satisfy the special rule applicable to tax shelters, i.e., that they reasonably believed that the tax treatment of the items in question was more likely than not the proper treatment. They contend that they are entitled to a waiver of the addition to tax under section 6661(c), providing:

SEC. (c). AUTHORITY TO WAIVE.—The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

Petitioners claim that respondent abused his discretion because an appeals officer recommended that the addition to tax not be imposed, but his recommendation was overridden by his supervisors, who gave no consideration to the facts and circumstances applicable to individual partners. Petitioners argue that the addition to tax was determined for an improper purpose, such as "to use as a bargaining chip in subsequent litigation." We cannot infer an improper purpose, however, where, as here, the evidence supports the propriety of imposition of the addition to tax.

Petitioners argue that they relied on a series of accountants and, therefore, had reasonable cause for any understatements of their tax and that they acted in good faith. The tax opinions in the promotional materials of the partnerships, however, set forth in detail anticipated challenges from the Internal Revenue Service and offered tax assistance. Petitioners' limited testimony was to the effect that they did not read everything. They cannot close their eyes to expressly acknowledged tax risks and then assert that they had "reasonable cause" or "acted in good faith" for an understatement resulting from successful Internal Revenue Service challenge. Because there is no evidence persuading us that petitioners were entitled to a waiver, we need not here examine the limits of respondent's discretion.

## Section 6621(c)

Respondent determined that petitioners are liable for additional interest under section 6621(c) on the ground that petitioners have substantial underpayments attributable to tax-motivated transactions. For purposes of section 6621(c), "tax-motivated transactions" are those described in section 6621(c)(3)(A), including (i) any valuation overstatement, (ii) any loss disallowed by reason of section 465(a), and (v) any sham transaction. As discussed above, we have not concluded that there was a valuation overstatement within the meaning of section 6659(c) or that petitioners' losses are disallowed by reason of section 465(a). We have, however, held that the Koppelman Process activities of the limited partnership were without economic substance and that the principal purpose of the arrangements was tax avoidance. The transactions to that extent were "sham" within the meaning of section 6621(c)(3)(A)(v). *Patin v. Commissioner*, 88 T.C. 1086, 1129 (1987), affd. sub nom. *Hatheway v. Commissioner*, 856 F.2d 186 (4th Cir., Aug. 23, 1988); see also *Cherin v. Commissioner*, 89 T.C. 986, 1000 (1987).

*Decision will be entered under Rule 155.*