ALFRED K. ADLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Adler v. Commissioner
Docket No. 24848-85
United States Tax Court
T.C. Memo 1989-597; 1989 Tax Ct. Memo LEXIS 598; 58 T.C.M. (CCH) 594; T.C.M. (RIA) 89597; October 31, 1989
Richard C. Fox, for the petitioner. William B. McCarthy, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for 1981 and 1982 in the amounts of $ 17,407 and $ 10,081, respectively, and an addition to tax pursuant to section 6661 [1] for 1982 in the amount of $ 1,006. The issues for decision are: (1) whether petitioner is entitled, in 1981 and 1982, to a distributive share of losses and credits claimed as a result of his investment in Thermo-Dynamics, Ltd. (Thermo-Dynamics or the Partnership); and (2) whether petitioner is liable, in 1982, for an *600 addition to tax pursuant to section 6661. FINDINGS OF FACT Preliminary Matters
Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner resided in Miami, Florida at the time he filed his petition. He was a limited partner in Thermo-Dynamics. Thermo-Dynamics reported losses for 1981 and 1982 in the amounts of $ 2,499,335 and $ 663,077, respectively. Of these amounts, petitioner claimed, as his distributive share, losses of $ 35,348 in 1981 and $ 9,378 in 1982; in addition he claimed an investment tax credit in 1982 in the amount of $ 5,714. Respondent disallowed the claimed losses and investment tax credit contending Thermo-Dynamics was not engaged in an activity for profit during the years in issue. The Limited Partnership; McIntyre's Other Ventures
Thermo-Dynamics was organized under the laws of Tennessee on December 1, 1981, for the purpose of developing and owning a mobile hazardous waste processor, subsequently named the MWP-100, which would dispose of liquid polychlorinated biphenyls (PCBs). Richard McIntyre (McIntyre) and Bruce Zwigard (Zwigard) *601 were its general partners. Under the sponsorship of McIntyre and pursuant to the terms of a private placement offering memorandum (the Offering Memorandum), thirty-five unregistered limited partnership units were offered for sale, on an installment payment basis, at $ 197,857 per unit. The Offering Memorandum informed potential investors that: (1) the Partnership had an option to acquire the MWP-100, which at the time was in the developmental stage by a company which had insignificant financial resources and no experience in hazardous waste disposal; (2) operation of the MWP-100 required certification by the United States Environmental Protection Agency (EPA); (3) neither general partner had experience in the treatment or disposal of hazardous waste materials; (4) the general partners would not devote their entire time and efforts to the affairs of the Partnership; (5) pursuant to a licensing agreement, the day-to-day management of the MWP-100 would be handled by Pyro-Manufacturing & Services Corporation (Pyro), which had an inherent conflict of interest as a result of operating a similar hazardous waste process for its own account; (6) the Partnership would probably incur substantial *602 losses during the first two years of its operation, however, each limited partner could deduct his distributive share of such losses on his individual tax return; and (7) investment in the Partnership was suitable only for investors in the 50 percent (or higher) marginal tax bracket. Despite its length, the 157-page Offering Memorandum contained less than a page as to how the Partnership intended to make a profit. Such sparsity stands in sharp contrast to the 41 pages the Offering Memorandum devoted to tax matters in addition to a 75-page tax opinion. Prior to, and concurrent with, the operation of the Partnership, McIntyre was the general partner of five coal mining partnerships. These partnerships had taxable losses between 1976 and 1984 in the millions of dollars. In addition, concurrent with the operation of the Partnership, McIntyre was the general partner of Vulcan Resources, which also was engaged in the research and development (R&D) of hazardous waste disposal systems. The Agreements
As of December 1981, Pyro-Magnetics Corporation (PMC), a Massachusetts corporation, held certain licensed know-how and patent rights, which had been developed by its principal *603 shareholder-employee, Kenneth Southwick (Southwick). On the basis of these patents, PMC and its subsidiaries, Pyro and Pyrotech Systems (PSI), developed the MWP-75, a first-generation mobile toxic waste processor. Prior to the Partnership's formation, McIntyre entered into negotiations with PMC, Pyro, and PSI for Pyro to conduct an R&D program in order to develop and construct an improved mobile hazardous waste processor (the MWP-100) for future delivery to the Partnership. These negotiations culminated in the Partnership, Pyro, and PMC entering into three agreements on December 1, 1981 -- a Research and Development Agreement (R&D Agreement), a Purchase Option Agreement (Option Agreement), and a Technology License and Service Agreement. 1. R&D Agreement
Pursuant to the R&D Agreement, Pyro agreed to develop and construct a prototype of an improved mobile hazardous waste processor for delivery to the Partnership by December 1, 1982, and the Partnership agreed to pay Pyro an R&D fee of $ 2,483,000. The R&D fee was payable: $ 550,000 at closing and $ 1,933,000 in the form of two notes, both bearing interest at the rate of 9 percent. The first of these notes was in the principal *604 amount of $ 583,000, and had a maturity date of March 31, 1982; the other note (the R&D Note) was in the principal amount of $ 1,350,000 and had a maturity date of December 31, 1996. The R&D Note required no payment of principal or interest prior to its maturity date unless the MWP-100 generated net income from operations. The R&D Agreement required Pyro to provide the Partnership with monthly written reports accounting for all R&D expenditures; it did not do so until October 1982. 2. Option Agreement
The Option Agreement granted the Partnership an option to purchase (1) the MWP-100 (to be developed under the R&D Agreement) at a purchase price of $ 4,000,000, and (2) a mobile waste processor suitable for the incineration of both liquid and solid waste (MWP-2000) (this latter option was never exercised). The Option Agreement provided that in the event EPA certification for the MWP-100 was not obtained, the Partnership could return the MWP-100 to Pyro and receive a refund for all amounts paid, and all notes given by the Partnership to Pyro in connection with the sale would be cancelled. The total cost of building the MWP-100 was 20 to 40 percent greater than that for *605 the MWP-75 (which had earlier been sold to Environmental Benefits, Inc. for $ 1,150,000). (The MWP-75 was technologically similar to the MWP-100 but had 25 percent less capacity.) On May 25, 1982, the Partnership exercised its option to purchase the MWP-100. Due to delays in delivery, the time for delivery of the MWP-100 was extended to November 30, 1982. 3. Technology License and Service Agreement
Pursuant to the Technology License and Service Agreement, the Partnership was granted a nonexclusive sublicense to use the technology developed under the R&D Agreement. In consideration for such sublicense, the Partnership agreed to pay Pyro a royalty of 20 percent of the net operating income it received from the operation of the MWP-100. PMC's Sale of Stock in Subsidiaries
PMC sold the stock of Pyro and PSI to Ensco, Inc. (Ensco) on November 1, 1982. Following such sale, PSI and Pyro became divisions within the Ensco group. The MWP-100 Acceptance Test
An acceptance test of the MWP-100 was performed over a 42-hour period from December 18, 1982 to December 21, 1982; such test was not conducted pursuant to EPA protocol. The material disposed of at the *606 test was not defined as hazardous, nor were the PCBs at this low level (40 parts per million) regulated by the EPA. (PCBs at a level under 50 parts per million are not addressed in the EPA regulations because they are not considered hazardous. PCBs at levels between 50 and 500 parts per million do not have to be incinerated, but can be disposed of in landfills.) Thus, the acceptance test was insufficient to give the MWP-100 an EPA license to dispose of PCB wastes. The Partnership engaged Gil M. Andreen (Andreen) to witness and evaluate the MWP-100's performance at the acceptance test. At the time, Andreen had performed consulting work for McIntyre for over 10 years. Andreen arrived at the test site on December 21, 1982, shortly after the acceptance test was completed; thus, he did not actually witness the test. Based on his review of a computer printout of the test results prepared by Pyro and PSI, Andreen telephoned McIntyre that evening and recommended that the Partnership accept delivery of the MWP-100. Written notification of this recommendation was sent to the Partnership in a letter dated December 27, 1982. On December 21, 1982, title to the MWP-100 was delivered by *607 Pyro to the Partnership. McIntyre executed two non-negotiable promissory notes (the Purchase Option Notes) on behalf of the Partnership on December 22, 1982, reflecting the $ 4,000,000 purchase price for the MWP-100. One promissory note was in the amount of $ 500,000, with a maturity date of December 21, 1996; the other was in the amount of $ 3,500,000 with a maturity date of December 31, 1997. Each note bore simple interest at the rate of 9 percent, each was non-recourse as to interest, and each provided that payment of principal or interest was not required prior to its maturity date unless the MWP-100 generated operating income. The Partnership insured the MWP-100 against all risks of direct physical loss or damage at a replacement value of $ 1,500,000. Lack of EPA Certification
PSI submitted to the EPA a Preliminary Permit Application for the MWP-100 mobile waste incinerator in August 1983 and a Trial Burn Plan in October 1983. In a letter dated December 22, 1983, the EPA notified PSI of certain deficiencies in the Trial Burn Plan; these deficiencies were subsequently corrected. The EPA trial burn of the MWP-100 occurred in July 1984. This trial burn was observed *608 by EPA employee Lee Kokoszka. At his direction, after three stoppages, the trial burn was terminated. The MWP-100 was damaged during this trial burn; the cost to repair such damage was approximately $ 20,000. The MWP-100 was rebuilt in September 1985 but did not receive EPA approval. The Partnership took no action against Pyro, PSI, or PMC under the warranty provisions of the Option Agreement, despite the MWP-100's failure to meet performance specifications or to receive EPA approval. As of the date of trial, the MWP-100 had not received the requisite EPA certification. Agreements with Ensco
The Partnership leased the MWP-100 to Ensco pursuant to an Equipment Lease Agreement (the Lease) dated December 30, 1985, with a base monthly rent of $ 65,000, and an annual escalation of 6 percent. Ensco was required to insure the MWP-100 for its "maximum insurable amount (a minimum of $ 1,500,000)." Also, on December 30, 1985, the Partnership and Ensco entered into a Security Agreement whereby Ensco granted a security interest in the MWP-100 to the Partnership to secure Ensco's lease obligations. As part of the Lease and Security Agreement, the Partnership executed three *609 new notes on December 31, 1985, in the amounts of $ 1,350,000, $ 3,500,000, and $ 500,000. These notes superseded the R&D Note and the Purchase Option Notes. Payments under the replacement notes were due from the Partnership within five days of its receipt of the rent from Ensco. If Ensco failed to make the required rental payments, then the Partnership did not have to satisfy its obligation to Ensco under the replacement notes. During the summer of 1986, Ensco removed various instrumentation from the MWP-100 which it then used for the MWP-75 acquired from EBI in the fall of 1985 for $ 1,250,000. At the time of trial, the MWP-100 was standing idle at Ensco's facility in Arkansas. Results of Operations
The results of the Partnership's operations from its inception through 1987 are as follows: TAXABLE YEAR
INCOME/(LOSS)
1981
($ 2,499,355)
1982
(    663,077)
1983
(  1,395,427)
1984
(    864,354)
1985
(    877,303)
1986
(     28,540)
1987
(    887,528)
OPINION Entitlement to Deductions and Credits
The threshold issue presented is whether petitioner is entitled to deduct on his 1981 and 1982 individual tax *610 returns his distributive share of Thermo-Dynamics claimed losses and investment tax credit. In order to avail himself of the tax benefits of such, petitioner must prove that Thermo-Dynamics was engaged in an activity for profit during the years in issue. [2]
To constitute a trade or business, the activity must be undertaken with the objective of realizing a profit. Brannen v. Commissioner, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In the case of a partnership, the aforementioned profit objective test is applied at the partnership level, on the basis of the activities of the partnership and of the general partners. Brannen v. Commissioner, supra.When the taxpayer is a limited partner, as petitioner is in this case, the primary focus is on the actions of the general partner. Finoli v. Commissioner, 86 T.C. 697 (1986). *611 The profit objective determination is based on all the facts and circumstances. Sutton v. Commissioner, 84 T.C. 210, 221 (1985); Brannen v. Commissioner, 78 T.C. at 506. In making this determination, more weight is given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. Thomas v. Commissioner, 84 T.C. 1244 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Engdahl v. Commissioner, 72 T.C. 659 (1979). The expectation of making a profit need not be reasonable but the taxpayer must have an actual and honest objective of making a profit. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984); Elliott v. Commissioner, 90 T.C. 960 (1988); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), *612 affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). In this context, "profit" means economic profit, independent of tax savings. Beck v. Commissioner, 85 T.C. 557 (1985); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). Thus, the existence of a profit objective is crucial to a determination that an enterprise is a trade or business. Sec. 183; Soriano v. Commissioner, 90 T.C. 44 (1988); Green v. Commissioner, 83 T.C. 667, 687 (1984). A transaction devoid of economic substance is not recognized for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Knetsch v. United States, 364 U.S. 361, 366 (1960). In Rose v. Commissioner, 88 T.C. 386, 414 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we applied an integrated approach to "separate the real economic aspects from the 'financial fantasies' surrounding a transaction." The Rose approach first investigates whether the venture was primarily organized to generate tax savings and should be *613 deemed a "generic tax shelter." See Rose v. Commissioner, supra. Once categorized as a generic tax shelter, the venture is then analyzed with objective factors to determine whether it is devoid of economic substance and should be disregarded for tax purposes. See Rose v. Commissioner, supra.
In Rose, we noted that while the subjective test is well founded in section 183, a unified approach emphasizing objective factors is preferable in cases involving generic tax shelters. Rose v. Commissioner, supra at 414. Under the Rose analysis, the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying sections 162 and 167. Rose v. Commissioner, supra at 414-415. A. Generic Tax Shelter
A "generic tax shelter" possesses some or all of the following common characteristics: (1) Tax benefits were the focus of the promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported *614 rights, difficult to value in the abstract and substantially overvalued in relation to the tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or substance. [Rose v. Commissioner, supra at 412.] Here, we think it proper to characterize the Partnership as a generic tax shelter. First, the primary focus of the Offering Memorandum was on the tax benefits to be obtained from the investment as opposed to the overall economic potential of the MWP-100. Second, although McIntyre testified that he engaged in serious negotiations for the purchase of the MWP-100 on behalf of the Partnership, we question whether such was the case. We believe the price paid by the Partnership for the MWP-100 was excessive. We reach this conclusion noting that the MWP-75, a technologically similar machine with 25-percent less capacity, was sold by Pyro in the fall of 1981 for $ 1,150,000. At trial there was uncontroverted testimony that the cost to build the MWP-100 was 20 *615 to 40 percent greater than the MWP-75. Furthermore, at all times since the MWP-100 was built, it has been insured for $ 1.5 million. Third, the technology the Partnership was to acquire under the R&D Agreement was difficult to assess in financial terms and in our opinion was substantially overvalued in relationship to the true value of the MWP-100 (when added to the $ 4 million purchase price). Moreover, over 50 percent of the R&D funding supplied by Thermo-Dynamics was in the form of long-term promissory notes. Accordingly, we find the Partnership to be a generic tax shelter subject to the unified objective analysis. See Rose v. Commissioner, supra at 412. Thus, petitioner may deduct his distributive share of the Partnership's losses and credits only if he can prove that the Partnership had economic substance and a sufficient business purpose existed. Rose v. Commissioner, supra.
B. Economic Substance and Business Purpose
The unified objective analysis attempts to determine whether a generic tax shelter is devoid of economic substance. Smith v. Commissioner, 91 T.C. 733, 753-756 (1988). The following four factors *616 are examined: (1) The investment activities of the Partnership and petitioner; (2) the relationship between fair market value and price; (3) the structure of the financing; and (4) perceived Congressional intent. Rose v. Commissioner, supra at 415-422. Application of these objective factors to the record in this case conclusively demonstrates that the Partnership lacked economic substance. 1. The Investment Activities of the Partnership and Petitioner
Potential investors were advised in the Offering Memorandum that neither McIntyre nor Zwigard had any experience in hazardous waste disposal. They were further informed that neither general partner would work on behalf of the Partnership full-time, and, in fact, the Offering Memorandum stated that the general partners would participate in competing businesses. McIntyre has a history of promoting tax shelters, ranging from coal to R&D, which have generated losses in the millions of dollars. Moreover, concurrent with the Partnership's activities, McIntyre was the general partner of a competing partnership, Vulcan Resources. The general partners of the Partnership did not approach the transactions *617 in a businesslike manner nor did they undertake any serious investigation into the marketability of the MWP-100 project. First, the Partnership received its first accounting of the R&D expenditures in October 1982, notwithstanding the contract provisions which required monthly accounting by Pyro to begin in January 1982. Second, the general partners failed to exercise due diligence in evaluating the commercial viability of the MWP-100. McIntyre testified that he relied on the recommendation of Andreen in accepting delivery of the MWP-100. Andreen has opined in the past as to the profitability of other McIntyre ventures, which in fact have been unsuccessful. Andreen performed no economic projections of his own regarding the MWP-100, but only reviewed the forecasted profit figures of the MWP-100's seller, Pyro. He did not witness the MWP-100 acceptance test, but simply reviewed the test results provided by Pyro, and on that basis, recommended that the Partnership accept delivery of the machine. Simply stated, we find that Andreen's recommendations were not based on regularly accepted business practice. Third, the commercial viability of the machine hinged on obtaining the requisite *618 EPA licensing. Notwithstanding the failure of the MWP-100 to obtain EPA licensing, the Partnership nevertheless exercised its option to purchase the machine. Since the date of delivery, the Partnership has failed to exercise its rights under the warranty provisions in the Option Agreement in which Pyro warranted that the MWP-100 would receive the necessary EPA licensing. The utter indifference exhibited by the Partnership regarding EPA licensing belies its interest in the economic potential of the MWP-100. It is simply another indication of the unbusinesslike manner in which the Partnership operated. 2. The Relationship Between Sales Price and Fair Market Value
At the time the MWP-100 was contracted for, the MWP-75, a technologically similar machine with 25 percent less capacity, was sold by Pyro for $ 1,150,000. Expert testimony presented by both parties revealed that the total cost of the MWP-100 was 20 to 40 percent greater than the MWP-75. Thus, even if viewed most favorably for the Partnership, the highest estimate would result in a sales price for the MWP-100 of $ 1,610,000 ($ 1,150,000 x 140%), rather than $ 4,000,000 which the Partnership purportedly paid. *619 Also, at all times since the MWP-100 was built and irrespective of who paid the premiums or was the beneficiary, it has been insured for $ 1,500,000. Accordingly, we agree with respondent that the facts surrounding the transaction indicate that the R&D expenses and the price paid by the Partnership for the MWP-100 were greatly inflated to increase the tax benefits for its investors and conclude that the fair market value of the MWP-100 does not support its purchase price. 3. The Structure of the Financing
The presence of deferred debt that is in substance or in fact not likely to be paid indicates a lack of economic substance. Knetsch v. United States, 364 U.S. 361 (1960); Rose v. Commissioner, supra at 419; Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). The substance, not the form, of such debt is examined. Waddell v. Commissioner, supra.
In this case, 54.37 percent ($ 1,350,000/$ 2,483,000) of the $ 2,483,000 purportedly spent by the *620 Partnership on R&D was "reflected" in a promissory note with a maturity date 15 years in the future. The postponement of the majority of R&D funding long into the future is contrary to normal commercial practice and makes no business sense. Smith v. Commissioner, supra at 762. In addition, the entire purchase price of the MWP-100 was "paid" by the Partnership in promissory notes with maturity dates 14 and 15 years in the future. The promissory notes in this case lack economic substance. The R&D payments reflected in the $ 1,350,000 promissory note and the Purchase Option Notes were never intended to be repaid. There is no evidence that any payments were made on these notes. Under these circumstances, the notes are nonrecourse in substance, if not in form. See Vastola v. Commissioner, 84 T.C. 969 (1985). 4. Perceived Congressional Intent
While Congress has authorized deductions and credits to encourage certain types of investment in R&D in addition to tangible assets, the Partnership in this case was not the intended beneficiary of such statutory incentives, such as Sections 174, 48, and 168. See Rose v. Commissioner, supra at 421-422. *621 "Such incentives are not intended, however, to create a new economy consisting of paper transactions having no relationship to the real value of goods and services. Thus, the mere presence of a valid business enterprise at some levels of a transaction does not automatically entitle passive investors distant from day-to-day operations of the enterprise to the associated tax benefits." Beck v. Commissioner, supra at 579-580. The activities of petitioner never surpassed those of an investor purchasing tax benefits. By failing the unified objective analysis, the activities of the Partnership lack economic substance and are disregarded for Federal income tax purposes. Our examination of the record results in the inescapable conclusion that petitioner's involvement in the transaction was limited to his obtaining a tax deduction rather than making a profit through the use of the MWP-100. The nature of the dealings by petitioner and the Partnership, the disparity between the purchase price and the value of the property acquired by the Partnership, and the illusory nature of the financing convinces us that the Partnership was a generic tax shelter devoid of economic substance *622 . Therefore, the transactions do not give rise to the losses and credits claimed by petitioner. Section 6661 Addition to Tax
Respondent determined that petitioner is liable for an addition to tax under section 6661 for taxable year 1982. With respect to returns, the due date for filing of which is after December 31, 1982, section 6661(a) imposes an addition to tax on any underpayment attributable to a substantial understatement of income tax. Section 6661(b)(1) defines a substantial understatement of income tax as an understatement exceeding the greater of 10 percent of the tax required to be shown on the return for the year or $ 5,000. Pursuant to section 6661(b)(2)(C), in the case of items attributable to a tax shelter, the amount of the understatement shall be reduced if the taxpayer has substantial authority for his treatment of the item and he reasonably believed that the tax treatment of such item was more likely than not the proper treatment. Section 6661(b)(2)(C)(i)(II). Under section 6661, tax shelters are defined as follows: (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal *623 purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Section 6661(b)(2)(C)(ii). We are satisfied that the principal purpose of petitioner's investment in the Partnership, and in fact, the very creation of the Partnership, was to avoid Federal income tax. Our discussion of the economic substance of the MWP-100 transaction reinforces this conclusion. Thus, we conclude that the Partnership is a tax shelter for purposes of section 6661. Petitioner has not provided any substantial authority for his claimed tax credits and losses, nor are we convinced petitioner reasonably believed that his tax treatment of the losses and credits was more likely than not the proper treatment. Having concluded that petitioner's substantial understatement of income tax was attributable to tax shelter items, we must now consider the proper rate of the section 6661 addition to tax. The correct rate of the addition to tax is 25 percent of the underpayment attributable to such understatement. Section 6661(a); Pallottini v. Commissioner , 90 T.C. 498 (1988). However, because respondent determined the addition to tax at a rate *624 of 10 percent in the notice of deficiency and failed to subsequently claim the addition to tax at the correct rate, it will be applied at the rate of 10 percent of the underpayment. Accordingly, respondent's determination of the section 6661 addition to tax, at a rate of 10 percent of the underpayment, is sustained. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded.↩
2. In general, a taxpayer may deduct costs paid or incurred by him for research or experimentation undertaken on his behalf by another organization or entity so long as such costs are incurred in connection with the taxpayer's trade or business. Section 174; section 1.174-2(a)(1) and (2), Income Tax Regs.↩