THEODORE W. DUTTON and JO S. DUTTON, Petitioners v. CMMISSIONER OF INTERNAL REVENUE, Respondent
Dutton v. Commissioner
Docket No. 4437-88
United States Tax Court
T.C. Memo 1990-462; 1990 Tax Ct. Memo LEXIS 507; 60 T.C.M. (CCH) 606; T.C.M. (RIA) 90462; August 28, 1990, Filed *507 Decision will be entered for the respondent. Morton D. Rosenthal and Arthur P. Generaux, for the petitioners. James S. Yan, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 12,257 in petitioners' Federal income tax for 1982 and an addition to tax of $ 3,064 under section 6661(a). *508 The issues for decision are (1) whether petitioners are entitled to deduct their allocable share of partnership losses resulting from research and development expenditures and (2) whether petitioners are liable for the section 6661 addition to tax. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the year in issue. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Petitioners resided in Upland, California, at the time the petition in this case was filed. The Formation of Techni-Matics
In 1982, petitioners became limited partners in a limited partnership known as Techni-Matics Two, Ltd. (Techni-Matics). Jacob Y. Terner (Terner) was the general partner of Techni-Matics. Theodore W. Dutton (petitioner) had known Terner for approximately 8 years prior to petitioners' involvement in Techni-Matics. Petitioner had a prior business relationship with Terner that involved the purchase, management, and sale of apartment houses in which Terner had been an investor. Terner provided petitioner with a booklet describing *509 the computerized technology that was being developed by Michael Leighton (Leighton). That technology involved computerized commodities futures trading systems. On June 15, 1982, petitioners entered into a limited partnership agreement with Techni-Matics. That agreement provided: Purpose. The business of the Partnership is to develop, lease, own, hold, re-lease, sell or otherwise dispose of and utilize commodity trading strategies for profit, and to engage in any and all activities related or incidental thereto. * * * Section 8.1. The total initial capital of the Partnership shall be $ 127,500. The capital of the Partnership shall be increased if and to the extent the Partners are required to make additional capital contributions by virtue of having executed Assumptions Agreements agreeing to become personally liable for a proportionate share of certain Partnership liabilities as set forth in Schedule A hereto. The Introduction and Summary of Proposed Partnership Activities contained in that agreement stated: There is the potential of substantial economic gain inherent with this investment, although no such gains or any gains or any return of any portion of the *510 investment can be guaranteed. If Compu-Com [Systems, Inc.] exercises its options to purchase the programs developed by the Partnership, and if Compu-Com is able to achieve the rate of growth forecast by management, there is the potential for the investor to realize gains of between ten (10) and twenty (20) times the amount of his initial capital investment over the ten year period described in the terms of purchase detailed in the "Lease" Agreement, paragraph 8. BEYOND THE POTENTIAL OF SUBSTANTIAL ECONOMIC GAIN, THE PROGRAM SHOULD PROVIDE A FIRST YEAR TAX WRITE OFF AGAINST ORDINARY INCOME OF APPROXIMATELY 400% OF THE DIRECT INVESTMENT. SUBSEQUENT EARNINGS OF THE PARTNERSHIP SHOULD BE IN THE FORM OF LONG TERM CAPITAL GAINS. EACH INVESTOR MUST RECOGNIZE THAT THIS IS A HIGH RISK INVESTMENT. THERE IS NO GUARANTEE THAT THE PROGRAMS BEING DEVELOPED BY THE PARTNERSHIP WILL EVER BE SOLD, THAT ANY OF THE REVENUE FORECASTS WILL EVER BE REALIZED, OR THAT THERE WILL BE ANY REVENUES TO THE PARTNERSHIP AT ALL. THE INVESTOR ALSO RECOGNIZES THAT HE IS PERSONALLY LIABLE ON HIS PRO RATA SHARE OF THE TEN YEAR NOTE PAYABLE TO AMLEN INVESTMENTS, LTD. AND THAT IF THERE ARE NOT SUFFICIENT REVENUES *511 TO THE PARTNERSHIP TO SERVICE AND RETIRE THIS DEBT, THE LIMITED PARTNER WILL BE REQUIRED TO MAKE ADDITIONAL CAPITAL CONTRIBUTIONS TO SERVICE AND RETIRE SAID DEBT. THE MAXIMUM LIABILITY OF EACH LIMITED PARTNER IS SPECIFIED AND LIMITED BY THE "ASSUMPTION AGREEMENT" EXECUTED BY THE LIMITED PARTNER. The Amlen Note
Amlen Investments, Ltd. (Amlen), was a Swiss corporation wholly owned by Retiga, A.G. David R. Shevitz was the president of Amlen. On June 15, 1982, Terner signed a $ 375,000 promissory note given by Techni-Matics to Amlen. The principal was payable 10 years from the date of the note, and interest was payable beginning on December 15, 1983, at 10 percent per year. In accordance with the Assumption Agreement, the partnership became liable to Amlen for the principal amount. Each limited partner assumed his or her pro rata share of that indebtedness. Petitioner's pro rata share was $ 51,000. Techni-Matics did not make an interest payment to Amlen on December 15, 1983. The Research and Development Contract with Tripoli
On June 15, 1982, a research and development contract was entered into between Tripoli Research Corporation (Tripoli) and Techni-Matics. Leighton *512 was the managing head of Tripoli. The agreement provided, in relevant part, that: The Company [Tripoli] shall undertake the Research Program on behalf of the Partnership [Techni-Matics] to develop advanced and improved theories and computer programs in an attempt to predict the behavior of commodity market prices. The following language appeared under the heading "Scope of Engagement": 2.4 This Contract is explicitly for research and experimentation in an experimental or laboratory sense and all expenses paid hereunder are intended to qualify as research and experimental expenditures within the meaning of Section 174 of the Internal Revenue Code and Regulation Section 1.174-2. No expenditures will be made for the ordinary testing or inspection of materials or products for quality control or for efficiency surveys, management studies, consumer surveys, advertising or promotion, and the parties shall have no obligation to undertake any such testing or surveys. In addition, no expenditures will be made for materials, labor or other factors to acquire, construct, install, or improve property produced as a result of the research and experimentation. *513 All expenditures contemplated under this Contract are to be made solely at the order and risk of the Partnership. The following language appeared under the heading "Rights to Trading Strategies": 3.2 The President of the Company, or any other person whom he may designate shall have the sole discretion and responsibility to determine when each Trading Strategy developed under the Research Program has reached that stage of development when further development would no longer qualify as research and experimentation under Section 174 of the Internal Revenue Code and Regulation Section 1.174-2 or when such Trading Strategy is reduced to practice, whichever event shall first occur. The criteria used by the Company in making such an evaluation shall be subject to approval by tax counsel to the Partnership. Upon reaching such a conclusion as to a Strategy, the Company shall issue a written report to such effect to the Partnership, describing the Trading Strategy and the date on which such evaluation was made. The contract required a $ 125,000 cash payment upon execution of the contract and the remaining $ 375,000 on or before December 15, 1982. After signing *514 the research and development contract with Techni-Matics, Tripoli subcontracted the research and development to Comile, Inc. (Comile); M.W.L. Systems; and C.I.S. Capital Corporation. Each entity was to design a different level of the trading program. Techni-Matics made the required payments to Tripoli in the amount of $ 500,000 for two trading strategies designed at a cost of $ 250,000 each. In November 1982, Techni-Matics opened a checking account at City National Bank. A notation on the signature card indicated that Leighton could sign for funds with his signature alone. Techni-Matics initially deposited $ 125,450 into that account. On November 15, 1982, Amlen issued a check for $ 187,500 to Techni-Matics. Techni-Matics then issued a check to Tripoli for $ 312,500. Tripoli thereafter issued a check to Orion Monetary Systems, Inc. (Orion), for $ 362,500. On November 29, 1982, Amlen issued a $ 187,500 check to Techni-Matics. Techni-Matics subsequently wrote a check to Tripoli for $ 187,500. The Lease to Compu-Com
On June 15, 1982, Techni-Matics agreed to lease the strategies developed by Tripoli to Compu-Com Systems, Inc. (Compu-Com). At that time, Leighton was *515 the president of Compu-Com, and Shevitz was the assistant secretary of Compu-Com. The lease agreement provided for nominal monthly rental payments. Compu-Com leased the programs but did not make any rental payments to Techni-Matics. The lease agreement contained an option to purchase at the end of 1 year. The option terms required that Compu-Com pay Techni-Matics a down payment of $ 34,000 together with the royalty from the first through fifth fiscal years equal to 1 percent of the gross income of Compu-Com in excess of $ 700,000 per year, with a minimum guarantee of $ 67,500 per year. For years 6 through 9, Compu-Com was to pay Techni-Matics a royalty of one-half percent of the gross income per year in excess of $ 700,000, with a minimum annual guarantee of $ 67,500. Compu-Com did not exercise the option. Terner subsequently became the president of Compu-Com. The Agreement with Orion
On June 15, 1982, Techni-Matics entered into an agreement with Orion in which Orion agreed to act as agent for Techni-Matics with respect to the administration of various agreements with Tripoli and the leases to Compu-Com. Among the management functions Orion was to perform were the opening *516 of a bank account and reviewing the work of subcontractors to ensure adequate progress was being made. Kay Buchanan, Leighton's mother, operated Orion. The Legal Opinion
Terner requested a legal opinion on the tax ramifications of the formation of Techni-Matics. The legal opinion provided by Hill, Farrer & Burrill, dated June 23, 1982, specifically addressed whether the partnership or the individual partners were able to deduct the amounts paid to Tripoli under section 174 as follows: Tripoli may contract with you, Mr. Leighton or one of your related entities to perform certain development work of the Trading Strategy. You have represented to us that the compensation to be paid to you, Mr. Leighton or your related entities for services rendered or for the use of computer facilities owned either by you or your controlled corporations will be reasonable and will be substantially similar to charges that could be expcted to be incurred between unrelated parties for the same or similar services or products being offered. * * * The Partnership (and the Partners as to their allocable shares thereof) should be eligible under Section 174 of the Code to treat the amounts *517 paid by the Partnership to Tripoli (subject to the caveat expressed above as to reasonableness of the expenditures) pursuant to the R&D Contract as expenses which are not chargeable to capital account. That letter also specifically addressed the relationship between the entities involved in the transaction with Techni-Matics as follows: 5. Related Entities. All corporations involved in the above scenario of transactions except for Amlen and Retiga, A.G. are controlled either indirectly or directly by Mr. Leighton. 6. Multiple Partnerships. While the transactions that are contemplated herein relate only to the Partnership, you have indicated that additional partnerships will be formed to develop Trading Strategies using different trading assumptions. In fact, you have requested an opinion as to the same matters herein for such other partnerships each of which will be formed and operated upon conditions substantially the same as those herein except that each will develop its own distinct Trading Strategy and each would probably consist of different individual investors. You have represented to us that each of the Trading Strategies that these partnerships will *518 develop will, and can be, determined to be wholly, separate and distinct from the Trading Strategies developed by the other partnerships or either by Compu-Com or any of your or Mr. Leighton's other related corporations or entities. Progress Reports
On March 10, 1983, Orion sent a letter to petitioner advising him that he would be receiving progress reports on the Techni-Matics partnership. On August 31, 1983, Orion sent petitioner a progress report. The progress report outlined the activities of the partnership and contained a separate sheet detailing the allocation of the partnership's adjusted gross income. That schedule provided a breakdown of the total accounts, allocation of income to the individual partners, and a breakdown of the profit and tax savings for each $ 8,000 unit. The progress report emphasized tax benefits as follows: The way the Advisor Program is structured provides tremendous economic potential for the "passive" Limited Partner Investors and for the working General Partner. The Advisor Program also provides significant favorable tax deductions for the Limited Partner Investors, ranging from 330% to 400% in 1983. The deductions are against ordinary *519 income and are not tax preference items. It is very likely that this same deduction will be available to the Limited Partners again in 1984 and 1985 without any additional capital investment on their part! The Sale to Fusilier Holdings, Ltd.
The programs that were ultimately developed by Tripoli could not be used by Compu-Com. Terner thereafter approached Leighton with respect to the sale of the two programs. On July 26, 1984, the sale of the programs was completed to a subsidiary of Noble Group S.A. (Noble), Fusilier Holdings, Ltd. (Fusilier), for $ 440,000. Noble was affiliated with Leighton. Fusilier was a Turks and Caicos Islands corporation with offices in Nassau, Bahamas. The agreement of sale provided that the purchase price was payable in cash or a cashier's check and was to be deposited in the Techni-Matics account with a Swiss corporation, Finagest. Both Fusilier and Finagest were affiliated with Noble. Terner did not seek other buyers or consult any experts concerning the fair market value of the programs. Terner and Leighton also negotiated terms for the sale to Fusilier of nine other software systems held by partnerships of which Terner was the general *520 partner. Tax Treatment
In 1982, Techni-Matics claimed an ordinary loss of $ 500,317. Of that amount, $ 500,000 was purportedly incurred as a research and development expense for the two computer programs relating to investment in the commodities futures market. On their 1982 Federal income tax return, Schedule E, petitioners reported a loss of $ 67,893 as their distributive share of losses sustained by Techni-Matics. Respondent disallowed that loss. OPINION Petitioners bear the burden of proof with respect to the issues in this case. Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 174
The tax benefits purportedly to be obtained by the various limited partnerships organized by Leighton and Terner were predicated on the deductibility, under section 174, of payments to other entities controlled by Leighton and Terner. Section 174(a) provides: In General. -- A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to *521 capital account. The expenditures so treated shall be allowed as a deduction. For expenses to be deductible under section 174, it is not necessary that they be incurred "in carrying on" a trade or business, as required under section 162. It is necessary, however, that they be incurred "in connection with" the trade or business of the partnership. See Snow v. Commissioner, 416 U.S. 500, 503 (1974). In Snow, the Supreme Court held that taxpayers need not be selling or producing a product in the year in which the deduction is claimed in order to qualify for deductions under section 174. The taxpayer must, however, be engaged in a trade or business at some time. Levin v. Commissioner, 87 T.C. 698, 724-725 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Green v. Commissioner, 83 T.C. 667, 686-687 (1984). As in other cases, we must examine *522 the facts and circumstances to see whether the activity claimed to constitute a business is conducted with continuity and regularity and whether the primary purpose for engaging in the activity is for income or profit. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Smith v. Commissioner, 91 T.C. 733, 762-764 (1988), on appeal (6th & 11th Cirs., Dec. 18, 1989). Respondent contends that petitioner is not entitled to a deduction for his share of the partnership research and development expenses in this case because the partnership was not engaged in a trade or business at any time. Petitioner asserts that to require a taxpayer to be engaged in a business at some time in order to be eligible for a deduction under section 174 discriminates between successful and unsuccessful research and development. Petitioner suggests a test that requires a taxpayer to intend and be capable of entering into a trade or business at some subsequent date. Whether or not petitioner's suggested modification of the language used in prior cases is adopted, we would be required to decide whether or not the partnership had the requisite profit objective. Profit *523 Objective
The existence of the requisite profit objective in a case involving a partnership is determined at the partnership level. Brannen v. Commissioner, 78 T.C. 471, 504-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Rosenfeld v. Commissioner, 82 T.C. 105, 112 (1984). Thus we must look at the objective of Terner in this case. A key question is whether Terner, when acting on behalf of Techni-Matics, was businesslike in delegating responsibility to Leighton and paying $ 500,000 to Leighton for his services on behalf of Techni-Matics, particularly when Terner and Leighton were involved in at least nine other entities competing with Techni-Matics. Terner testified and described himself as an "amateur in commodities." Otherwise, he was a physician who had dealt extensively in real estate limited partnerships. He relied entirely on Leighton. All of the entities involved in the transaction with Techni-Matics were controlled by Leighton or his associates, and cash contributed by investors such as petitioner was moved from one entity *524 to another. The partners were not advised of the progress of development of the trading strategies in any formal manner. Petitioner was sent a progress report by Orion, a company operated by Leighton's mother. In explaining the function of Orion, Leighton testified: "apparently, according to the attorneys you can't take a current deduction on the cost of administrative work concerned with the design of the program. So that was broken out separately under the Orion heading." Leighton's testimony about the services he allegedly performed for Techni-Matics, which paid $ 500,000, was vague. The few documents that he produced were undated or otherwise were not shown to be related to work performed for Techni-Matics. Leighton testified that fees were derived by a process that included increasing his hourly rate used in computations from $ 225 per hour to $ 300 per hour. The services that he allegedly performed for these fees, however, were amorphous. On cross-examination, Leighton testified: A I am responsible for the development of the systems. I am the only one in the company who, it turned out, was able to conceive of and supervise the developments of the programs themselves. *525 As I would first conceive of and denote the direction of specific program work, such as these two descriptions for the programs which were ultimately developed for Technomatics II, I would go through a process of asking the computer department for a series of computer runs which I would use as the basis for scanning to find out whether or not the reference conditions that were the basis of the program that I wanted to develop appeared relevant. After attempting unsuccessfully to specify work performed by particular employees on a list provided by petitioners, Leighton stated: A * * * With respect to the design work of these programs, it would be more a function of gathering data for me and interfacing with programmers, following up schedules of program development, watching over the work schedules of the other employees so that I didn't have to do that so that my time was free for the more conceptual, esoteric elements of systems design. Leighton asserted that he was not responsible for details, such as whether Compu-Com paid rent to Techni-Matics: Q Did Compu-Com actually lease the two programs, initially? A I'm not sure that that shows here, but I believe, yes, *526 that they did. Q And how much did Compu-Com pay to Technomatics II as rental payments? A Whatever would have been called for by the agreement. I was not a bookkeeper. I don't know. I don't know the amount that it paid. That wasn't my job. If it says a number in here, I'll be happy to look through and find the number for you, but I'm sure you already know the answer. Q Well, the problem is that there is no amount stated in the lease agreement. A That's something you should ask the attorneys about that prepared the agreements. Q Did you sign these agreement[s]? A Yes. I signed lots of things. About another employee, he testiied: Q Okay. And then on line seven, there's a name called Tanna Leighton. A Yeah? Q And what did she do? A She was my ex-wife. Q Okay. A I just put her on the -- I got permission from Noble to put her on a monthly consulting fee as a part of the divorce settlement. The foregoing quotations provide the flavor of Leighton's testimony. Leighton "guessed" that over the period of 2 years, 1981 and 1982, Tripoli had collected between $ 5 million and $ 6 million in research and development fees from the various partnerships. *527 He indicated that he was involved in seven or eight limited partnerships in 1981 and again in 1982. Even if the services would produce a profit on behalf of a single entity, petitioners have given us no reason to believe that such success could be spread over multiple partnerships. See Rose v. Commissioner, 88 T.C. 386, 417 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Skripak v. Commissioner, 84 T.C. 285, 324-325 (1985); Estate of Baron v. Commissioner, 83 T.C. 542, 556-558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). No evidence was presented that Leighton's fees were reasonable. Petitioner and Terner were apparently indifferent to the reasonableness of the fees to be paid to Leighton and entities controlled by him. The investment was presented to petitioner as a package with no opportunity for negotiation. The offering materials emphasized in bold print the tax benefits the participants hoped to obtain but did not have any information on the value of the programs or the market conditions for sale of the programs if and when they were developed. The interrelationships between entities in which *528 Leighton and Terner were involved were disclosed in the opinion letter. The opinion letter also warned that deductibility of the expenses was contingent on the reasonableness of the amounts paid for research and development. The failure of Terner or petitioner to inquire about the reasonableness of the amounts in view of the multiple warnings is unexplained and undermines their claim of profit objective. Respondent relies on Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724 (9th Cir. 1986), affg. a Memorandum Opinion of this Court, as authority for concluding that the dominant motive for creation of the partnership in this case was tax avoidance. In that case, a limited partnership was allegedly formed for the purpose of developing patents. The key factors leading to the conclusion that the partnership did not have a profit objective were the inflated purchase price of the patents and the lack of arm's-length dealings. Those factors are certainly persuasive in this case. Petitioner contends that Independent Elec. Supply, Inc. was an abusive tax shelter case distinguishable from this case. Petitioner argues that (1) this case involved an actual *529 payment of funds to Tripoli with the limited partners signing assumption agreements on the notes, instead of a small down payment and a large promissory note that is often present in abusive tax shelter cases; (2) this case involves a one-to-one write-off as opposed to a grossly disproportionate write-off; and (3) the actual sale of the programs demonstrates that the programs had value and that that value equaled 88 percent of the cost of the programs. Further, petitioner asserts that: Reviewing the actual economic implications of this transaction in hindsight clearly demonstrates that it was not a tax avoidance scheme from the inception. This can be demonstrated by assuming maximum tax brackets and considering the fact that the partnership wrote off $ 500,000.00 in deductions in 1982, which would have an economic benefit of $ 250,000.00. However, to obtain this benefit, the partnership had to part with $ 125,000.00 of cash and it reported the sale of the product at a taxable gain of $ 440,000.00 which, assuming again maximum tax benefits, would incur an $ 88,000.00 tax liability. Accordingly, we see the partnership has spent $ 213,000.00 in cash and taxes in order to obtain *530 a tax benefit of $ 250,000.00, leaving a net economic advantage of $ 37,000.00. * * * It is totally inconceivable that the limited partner, such as petitioners would enter a pre-conceived plan such as this for a return of 7.4%. Petitioner's argument is unconvincing. There was no negotiation at the time of the sale of the programs to Fusilier, a Noble subsidiary located in the Turks and Caicos Islands. The loan from Amlen, originally due 10 years after the date of execution, was repaid from the proceeds of that sale. Shevitz, the president of Amlen, was also an assistant secretary of Compu-Com. Other programs of entities in which Terner was a general partner were also sold to Fusilier. Whether or not the sale was part of "a preconceived plan," it was not conducted at arm's length but appears to be the final arc in a circular transfer of funds. See Drobny v. Commissioner, 86 T.C. 1326, 1346 (1986). For all of the foregoing reasons, we conclude that petitioners have not proven that the Techni-Matics partnership had the requisite profit objective. They have not proven that the partnership was or would ever be in the trade or business of software leasing *531 or development, and their deductions are not allowable under section 174. Section 6661
Section 6661 provides an addition to tax equal to 25 percent of the underpayment of tax attributable to a substantial understatement of income tax. Sec. 6661(a). Section 6661(b)(2)(B)(i) provides for a reduction of the amount of the understatement by that portion of the understatement that is attributable to the tax treatment of any item if there is or was substantial authority for such treatment. In tax shelter cases, the understatement is reduced if the taxpayer also shows that he reasonably believed that the tax treatment of the items in question was more likely than not the proper treatment. Section 6661(b)(2)(C)(ii) provides that a partnership is a tax shelter if the principal purpose of the partnership is the avoidance or evasion of Federal income tax. Petitioner argues that Techni-Matics did not have a principal purpose of avoidance or evasion of Federal income tax. Petitioner further argues that *532 substantial authority existed for the position taken on petitioners' return. In Antonides v. Commissioner, 91 T.C. 686 (1988), affd. 893 F.2d 656 (4th Cir. 1990), we set forth the following analysis to be applied in determining whether a taxpayer has substantial authority for a position: In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. * * * * * * The weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the treatment of the item. Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs. *533 [91 T.C. at 702-703.] Petitioner argues that he relied on the opinion of tax counsel and the authority cited in the opinion letter written by counsel that was included in the limited partnership offering materials. Respondent contends that the opinion letter provides no basis for reliance by petitioner. Respondent argues, and we agree, that the opinion letter was written on the assumption of facts that were false or without support. The authority cited in that opinion was cited as authority for a factual situation where the fees paid were reasonable and were incurred in connection with a trade or business. Therefore, even if we apply the lesser standard of substantial authority, petitioner's authority is materially distinguishable. Finally, we are not persuaded that petitioner reasonably believed that the tax treatment of the items was more likely than not the proper treatment. The opinion letter upon which petitioner claims reliance is replete with caveats and assumptions. Petitioner was advised by the opinion letter of Leighton's multiple and conflicting roles. That letter warned that any section 174 deduction was subject to the reasonableness of the amounts *534 claimed for research and development. Petitioner has not proven that the expenses claimed were reasonable or that he made any effort to find out whether they were reasonable. Petitioners are liable for the section 6661 addition to tax. In light of the foregoing, Decision will be entered for the respondent.